STATE of Utah, Plaintiff and
Respondent,

v.

Chad A. GARDINER, Defendant
and Petitioner.

No. 890231.

Supreme Court of Utah.

June 18, 1991.

R. Paul Van Dam, David B. Thompson, Salt Lake City, for State of Utah.

Harry H. Souvall, Vernal, for Gardiner.

## ON CERTIORARI TO THE UTAH COURT OF APPEALS

ZIMMERMAN, Justice:

Defendant Chad Gardiner appeals from a conviction of assaulting a peace officer under section 76-5-102.4 of the Code and a conviction of interfering with a peace officer under section 76-8-305 of the Code. Utah Code Ann. §§ 76-5-102.4, 76-8-305 (1990). These convictions arose out of an incident in which Gardiner refused to permit an officer to conduct a search of the premises where a party was in progress. Gardiner claims that he had a right to forcibly resist the officer's illegal search and the ensuing arrest.

Gardiner's claims on appeal are several. First, he argues that he had a right to resist because in *State v. Bradshaw*, 541 P.2d 800 (Utah 1975), this court recognized a citizen's common law right to forcibly resist an illegal arrest by a peace officer. Second, he asserts that he could not be guilty of violating section 76-5-102.4 because it only bars the assaulting of a peace officer acting within the scope of his or her authority. He contends that the officer's entry into the building was illegal and, therefore, the officer was not acting within the scope of his authority. Finally, he contends that section 76-2-406 of the Code, a statute permitting the use of force to defend property, gave him the right to resist the officer's search of his property. We disagree with all of Gardiner's contentions and uphold his convictions.

We recite the facts in a light most favorable to the State, the prevailing party below. *See State v. Verde*, 770 P.2d 116, 117 (Utah 1989); *Lamkin v. Lynch*, 600 P.2d 530, 531 (Utah 1979); *Paull v. Zions First Nat'l Bank*, 18 Utah 2d 183, 184, 417 P.2d 759, 760 (1966).

During the early morning hours of April 17, 1988, the Uintah County Sheriff's Department received an anonymous complaint that a loud party was in progress at the Vernal City Airport and that minors were consuming alcohol at that party. At approximately 3 a.m., Deputy Jim Lytle was dispatched to the airport to investigate the complaint. Vernal City Officer Steve Hatzidakis and Reserve Officer Terry Shiner responded to assist Deputy Lytle in his investigation.

The officers located a party at the Dinaland Aviation building. While Officer Hatzidakis was talking to individuals in a vehicle near the building, he noticed that someone was attempting to close a sliding door on the building. Officer Hatzidakis went to the doorway. There, he smelled a strong odor of alcohol and saw several people within the building whom he believed to be minors. He announced his intention to enter the building to check for the presence of minors.

At that point, defendant Chad Gardiner, who was in the building, stepped forward and stated that his father owned the building. Gardiner asked the officer for a search warrant. Upon being told that the officer had no warrant, Gardiner said that Officer Hatzidakis could not enter, stepped within eight to ten inches of the officer at the doorway, and extended his arm to the side to block the door and prevent the officer from entering. Officer Hatzidakis pushed Gardiner, who then fell backward onto a table, which collapsed under him. Gardiner got up, rushed toward Officer Hatzidakis, and punched him in the face. The blow knocked the officer out of the building. Outside the building, a struggle ensued between Gardiner and the three officers. After being informed by Officer Hatzidakis that he was under arrest, Gardiner did not stop fighting but again punched the officer in the face. Gardiner was ultimately subdued and taken to jail.

Gardiner was charged with two counts of assaulting a peace officer, one count of interfering with a peace officer, and one count of intoxication in a private place. The case was heard without a jury by Judge A. Lynn Payne of the Eighth Circuit Court of Uintah County. Judge Payne found Gardiner guilty of one count of as-

saulting a peace officer and one count of interfering with a peace officer. *See* Utah Code Ann. §§ 76–5–102.4, 76–8–305 (1990). Gardiner was fined $500 and given a one-year suspended sentence.

Gardiner appealed his convictions. In an unpublished opinion, the Utah Court of Appeals ruled that the search by Officer Hatzidakis was illegal because there were no exigent circumstances that justified a warrantless search. However, the court went on to say that the legality of the search was not the pivotal issue. Rather, the deciding issue was whether a citizen has the right to forcibly resist a peaceful search by an officer when that search is at some later date determined to be illegal. The court followed a decision from Alaska, *Elson v. State*, 659 P.2d 1195 (Alaska 1983), and declined to recognize the English common law rule that a citizen does have such a right. Instead, the court of appeals held that one may not resist a search by an officer, even if illegal, "unless [the] defendant can show that the officer was not . . . acting pursuant to his [or her] authority, or had used excessive force." *State v. Gardiner*, No. 880557 (Utah Ct.App.1989). Because defendant had not carried his burden on these issues, the court affirmed his conviction for assaulting a peace officer.

▇ Gardiner then petitioned for a rehearing, arguing that the court of appeals' holding' was in conflict with this court's decision in *State v. Bradshaw*, 541 P.2d 800 (Utah 1975). In *Bradshaw*, this court held that a Utah statute making it unlawful for a citizen to forcibly resist an illegal arrest was written so as to make it unconstitutionally vague. *Bradshaw* went on to say in dicta that if the legislature, in passing the statute in question, had intended to punish a citizen who refused to "willingly submit to an unlawful arrest," then the statute would also violate both the state and federal constitutions. *Id.* at 801. This dicta, claimed Gardiner, plainly recognized the English common law right to resist an unlawful arrest; indeed, it constitutionalized it. Because an illegal search is directly analogous to an illegal arrest, Gardiner argued, *Bradshaw* governed the present case and the court of appeals' holding was in direct conflict with *Bradshaw*. The court of appeals denied Gardiner's petition without comment.[1] This court then granted Gardiner's writ of certiorari.

In passing on Gardiner's claims, we first note that the court of appeals affirmed his conviction for assaulting a peace officer under section 76–5–102.4 of the Code, but did not mention his conviction for interfering with a peace officer under section 76–8–305 of the Code. Our review of Gardiner's brief in the court of appeals makes it clear that he appealed from both convictions and that his challenges to both were virtually identical. Therefore, we presume that the court of appeals intended its ruling to apply to both convictions. We will address both convictions in our opinion.

---

1. We note with some concern the court of appeals' use of rule 31 of the Utah Rules of Appellate Procedure to dispose of this case via an unpublished opinion, even after *Bradshaw* was called to its attention. Rule 31 allows an appellate court to "dispose of any qualified case" in an unpublished opinion upon its own motion. However, by its own terms, the rule is not appropriate for use where there are "substantial constitutional issues, issues of significant public interest, issues of law of first impression, or complicated issues of fact or law." Utah R.App.P. 31.

Here, the initial court of appeals' opinion established a new rule of Utah law, as the opinion itself acknowledged; yet that opinion was unpublished. Then the court of appeals denied Gardiner's petition for rehearing, which brought to the court's attention dicta in *Bradshaw* that appeared to be flatly contrary to the new rule announced in the unpublished opinion; yet the opinion remained unpublished. In sum, this case rather plainly was not one that could be properly disposed of under rule 31.

The evils of unpublished opinions have been commented upon by many. Given the paucity of precedent in Utah, there seems little justification for their use here. "[I]f a case deserves being disposed of by written opinion, that opinion should be published. If a decision truly adds nothing to the law, it should be disposed of from the bench or by a short written order that may be informative to the parties but to no one else." *Paffel v. Paffel*, 732 P.2d 96, 104 (Utah 1986) (Zimmerman, J., concurring). For a discussion of the potential problems associated with unpublished opinions see Reuben, *Published in Part, Buried in Part*, 16 Litig. 4 (Summer 1990), and *Paffel v. Paffel*, 732 P.2d 96, 104 (Utah 1986).

■ We also note our acceptance of the court of appeals' conclusion that Officer Hatzidakis's search of the building was illegal. This court has held that absent one of a narrow category of exigent circumstances, warrantless searches are "per se unreasonable under the fourth amendment." *State v. Ashe*, 745 P.2d 1255, 1258 (Utah 1987); *see also State v. Christensen*, 676 P.2d 408, 411 (Utah 1984). That principle has as much, if not more, force under the Utah Constitution. *See State v. Larocco*, 794 P.2d 460, 466–68 (Utah 1990). Therefore, this case squarely presents the question of whether Gardiner had a common law or statutory right to resist what was later determined to be an illegal search. Gardiner makes three separate arguments attacking his convictions, but all are really variations on a theme.

■ Gardiner's first contention is that our decision in *Bradshaw* adopted the English common law rule that a person can forcibly resist an unlawful arrest and, therefore, that he had the right to forcibly resist Officer Hatzidakis's search of Dinaland Aviation. Response to this argument requires a rather detailed discussion of *Bradshaw*.

The defendant in *Bradshaw* was charged with resisting arrest in violation of what was then section 76–8–305 of the Code. *See* Utah Code Ann. § 76–8–305 (Supp. 1973). That statute read: "A person is guilty of a class B misdemeanor when he [or she] intentionally interferes with a person recognized to be a law enforcement official seeking to effect an arrest or detention of himself [or herself] or another regardless of whether there is a legal basis for the arrest." *Id.* The defendant challenged the constitutionality of the statute, claiming that it violated the search and seizure clause of the Utah Constitution. *See* Utah Const. art. I, § 14. Although the opinion is not clear on this point, he apparently claimed that an illegal arrest amounted to an unreasonable seizure.

The majority opinion, written by Justice Tuckett, joined by Justice Maughan, and separately concurred in by Justice Henriod, did not dispose of the case on the defendant's contention, but instead struck the statute down as invalid on vagueness grounds. The court reasoned that terms such as "regardless of whether there is a legal basis for the arrest" and "interferes" could have a number of meanings and interpretations. On that basis, this court concluded that the statute "fail[ed] to inform an ordinary citizen who is seeking to obey the laws as to the conduct sought to be proscribed." *Bradshaw*, 541 P.2d at 802.

Although the *Bradshaw* majority did not decide the case on the basis that a person had a right, constitutional or otherwise, to use force to resist an illegal arrest, it did reach this issue in dictum. Justice Tuckett's opinion stated:

If the intention of the legislature was to penalize a law-abiding citizen by incarceration because he [or she] did not willingly submit to an unlawful arrest, a statute authorizing the same is in violation of both the Utah and United States Constitutions ... in that it permits and authorizes an arrest without probable cause and without lawful basis for the arrest.

*Id.* at 801. Justice Henriod, in his separate concurrence, stated that he would have struck the statute down not only on vagueness grounds, but also on the ground that the statute violated the state search and seizure provisions by making unlawful any resistance to an illegal arrest. *Id.* at 803–05.

The two dissenters wrote separate opinions. Each disagreed with the statement in the majority opinion that it would be unconstitutional for the legislature to make it unlawful to resist an illegal arrest. *Id.* at 805 (Ellett, J., dissenting); *id.* at 806 (Crockett, J., dissenting). Justice Ellett explained his view of the matter by noting:

The common law gave a person the right to resist an unlawful arrest, but times have changed since the time when self-help was permitted to prevent a wrongful arrest. At common law, arrests were often made by citizens. Judges were not available for speedy release on bond, and trials were long de-

layed. Such conditions no longer exist. An arrested person must be taken forthwith before a magistrate, and trial must not be unreasonably delayed. A defendant is entitled to bail in a reasonable amount.

*Bradshaw,* 541 P.2d at 805. In his view, these protections mooted the majority's objection to the statute's substance. "[The statute] does not permit an unlawful seizure (arrest). It merely transfers the right of redress for a wrongful arrest to the orderly procedure of a court trial instead of a brawl in the streets." *Id.*

Gardiner asserts that the majority in *Bradshaw* adopted the common law right to forcibly resist an illegal search or arrest. We acknowledge that the language of both Justice Tuckett's majority opinion and Justice Henriod's concurrence does suggest not only a common law right to forcibly resist an illegal arrest and, by extension, an illegal search, but also a state and federal constitutional right as well. However, no matter how strongly a majority of the members of the court which sat on *Bradshaw* in 1975 felt about this issue, they did not decide the case on this ground. The majority's holding of unconstitutionality was based on vagueness alone. Any discussion of the substantive right to resist is dictum only, and this court is not bound by earlier dicta. *See State v. Rimmasch,* 775 P.2d 388, 400 (Utah 1989). Therefore, the comments of the majority in *Bradshaw* on this issue are not controlling, and this court has yet to pass upon whether Utah recognizes the availability of a common law right to forcibly resist an illegal search or arrest and the scope of that right.

The English common law right to forcibly resist one attempting to effect an illegal arrest was established almost three hundred years ago in *Regina v. Tooley,* 2 Ld. Raymond Rep. 1296, 1299–1301 (Q.B. 1709). As Justice Ellett's dissent in *Bradshaw* noted, the *Tooley* case was decided at a time when an illegal arrest posed grave risks for a defendant. Most arrests were made by private citizens, not by public officers. Bail for felonies was unattainable, and years might pass before royal judges arrived for a jail delivery. Under such circumstances, there was no speedy or effective way to challenge an illegal arrest. The adoption of the *Tooley* rule seemed at that time both reasonable and justifiable. *See* S. Warner, *The Uniform Arrest Act,* 28 Va.L.Rev. 315, 330 (1942) [hereinafter "Warner"].

However, this common law right has been subjected to extensive criticism. *See, e.g., State v. Hatton,* 116 Ariz. 142, 147, 568 P.2d 1040, 1045 (1977); *People v. Hess,* 687 P.2d 443, 447 (Colo.1984); Warner at 330–31. The criticism of the self-help doctrine is based on the fact, noted by Justice Ellett's dissent, that the dangers flowing from illegal arrests which existed when the rule was adopted are substantially reduced today. *Bradshaw,* 541 P.2d at 805 (Ellett, J., dissenting). An arrestee now has the "benefits of liberal bonding policies, appointed counsel in the case of indigency, and the opportunity to be taken before a magistrate for immediate arraignment and preliminary hearing." *State v. Richardson,* 95 Idaho 446, 450, 511 P.2d 263, 267 (1973).

Similar considerations support a rejection of the doctrine where illegal searches are concerned. The Supreme Court of New Mexico in *State v. Doe,* 92 N.M. 100, 583 P.2d 464 (1978), summarized the dangers of the common law self-help rule and its reasons for rejecting that rule where searches are concerned:

> Self-help measures undertaken by a potential defendant who objects to the legality of the search can lead to violence and serious physical injury. The societal interest in the orderly settlement of disputes between citizens and their government outweighs any individual interest in resisting a questionable search. One can reasonably be asked to submit peaceably and to take recourse in his legal remedies.

*Doe,* 92 N.M. at 102–03, 583 P.2d at 466–67 (citations omitted). Further, in cases of illegal police searches, the subject of the search has "the assurance that any evidence so acquired is rendered inadmissible in a subsequent criminal trial." *United*

*States ex rel. Kilheffer v. Plowfield*, 409 F.Supp. 677, 680–81 (E.D.Pa.1976); *see also State v. Larocco*, 794 P.2d 460, 471 (Utah 1990). This was most certainly not the case at common law.

Because the justification for the common law doctrine has all but disappeared, and because of its potential for causing violent confrontations between police, who are usually armed, and private citizens, the modern trend is to reject the common law right.[2] Thus, in most states a citizen may not use force to resist an illegal arrest unless the officer uses excessive force. *Commonwealth v. Moreira*, 388 Mass. 596, 600, 447 N.E.2d 1224, 1228 (1983).[3]

For like reasons, some courts have extended this rejection of the common law right to resist an illegal arrest to illegal searches as well, including the Supreme Court of Alaska in the decision relied upon by the court of appeals, *Elson v. State*, 659 P.2d 1195 (Alaska 1983). In that case, the defendant had been pulled over for suspicion of drunk driving. As the officer performed a "pat down," he noticed a hard object in the defendant's right pants pocket. The officer then attempted to remove the object, and the defendant resisted. Before the Alaska Supreme Court, the defendant argued that he had a constitutional right to forcibly resist what he believed to be an illegal search. The court disagreed and held, "[A] private citizen may not use force to resist a peaceful search by one who he knows or has good reason to be-

lieve is an authorized police officer performing his duties, regardless of whether the search is ultimately determined to be illegal." *Id.* at 1200.

The Supreme Court of New Mexico had previously come to the same conclusion and adopted a rule similar to that in *Elson. Doe*, 92 N.M. at 102–03, 583 P.2d at 467; *see also United States v. Ferrone*, 438 F.2d 381, 390 (3d Cir.), *cert. denied*, 402 U.S. 1008, 91 S.Ct. 2188, 29 L.Ed.2d 430 (1971) (a person cannot forcibly resist a peace officer's execution of a search warrant later found to be illegal); *Hatton*, 116 Ariz. at 148, 568 P.2d at 1046.

■ Based on the foregoing discussion and the trend in other states, were we free to do so, we would be inclined to reject the English common law and adopt the diluted defense to an illegal search or arrest articulated in *Elson* and similar decisions.[4] However, we conclude that we are not free to fashion such a rule because the legislature has already acted in the area. Common law rights to resist arrest are not relevant where the common law has been replaced by statute.

When the Utah legislature enacted the Utah criminal code in 1973, it abolished all common law crimes. Utah Code Ann. § 76–1–105 (1973). Now, in Utah a person is guilty of a crime only if that person's actions and state of mind fit within the statutory definitional elements of a crime. *E.g.*, Utah Code Ann. § 76–1–105; *State v.*

**2.** In the following cases, courts have rejected the common law rule: *Miller v. State*, 462 P.2d 421, 427 (Alaska 1969); *State v. Hatton*, 116 Ariz. 142, 147–48, 568 P.2d 1040, 1045–46 (1977); *State v. Richardson*, 95 Idaho 446, 451, 511 P.2d 263, 268 (1973); *State v. Thomas*, 262 N.W.2d 607, 610–11 (Iowa 1978); *State v. Austin*, 381 A.2d 652, 655 (Me.1978); *In re Welfare of Burns*, 284 N.W.2d 359, 360 (Minn.1979); *State v. Nunes*, 546 S.W.2d 759, 762–63 (Mo.Ct.App. 1977); *State v. Koonce*, 89 N.J.Super. 169, 183–84, 214 A.2d 428, 435–36 (1965); *State v. Doe*, 92 N.M. 100, 102–03, 583 P.2d 464, 467 (1978); *Columbus v. Fraley*, 41 Ohio St.2d 173, 179–80, 324 N.E.2d 735 (1975).

**3.** In *Moreira*, the Supreme Judicial Court of Massachusetts conducted an in-depth analysis of this issue. Through its research, it concluded that at that time eleven states by judicial deci-

sion and nineteen states by legislative enactment had determined that "a person may not resist an unlawful arrest which is accomplished without excessive force." *Moreira*, 388 Mass. at 600, 447 N.E.2d at 1228.

**4.** The Alaska Supreme Court addressed an additional issue in *Elson*. A footnote in that decision warned that the rule it adopted barring the use of force to oppose a search does not apply where the officer uses "excessive or unnecessary force in conducting the search." *Elson*, 659 P.2d at 1200 n. 18. This qualification resulted from the court's concern that in instances where the officer uses excessive force in effecting a search, the defendant must have the legal right to defend against that excessive force. *See Gray v. State*, 463 P.2d 897, 908 (Alaska 1970). Were we to adopt the approach, we would incorporate this view into our test.

*Maestas,* 652 P.2d 903, 904 (Utah 1982). *State v. Pearson,* 680 P.2d 406, 408 n. 4 (Utah 1984). Similarly, the legislature enacted a number of general defenses as well as numerous specific defenses which are included in the various statutory provisions. However, in codifying these defenses, it did not enact a generally available defense based on the illegality of police conduct. *See* Utah Code Ann. §§ 76-2-401 to -406 (codifying defenses for minority, compulsion, entrapment, ignorance of fact which negates specific mental state, and mental illness). We consider the enactment of these specific and varied defenses and the failure to enact any general illegality defense to impliedly preclude us from finding any generally available common law right to resist an illegal search or arrest. If such a defense exists in Utah, it must be grounded in the specific code sections under which Gardiner was convicted.

■ The first crime of which he was convicted is assault on a peace officer, a crime under section 76-5-102.4 of the Code. Section 76-5-102.4 provides:

> Any person who assaults a peace officer, with knowledge that he [or she] is a peace officer, and when the peace officer is acting within the scope of his [or her] authority as a peace officer, is guilty of a class A misdemeanor.

Utah Code Ann. § 76-5-102.4 (1990). The only language in this section that could be construed as giving any sanction to a right to resist an unlawful arrest is the phrase "and when the peace officer is acting within the scope of his [or her] authority as a peace officer." However, this is not equivalent to the common law defense. Under section 76-5-102.4, the State must show, as an element of proof of the offense, that the officer was "acting within the scope of his [or her] authority as a peace officer." The defendant has no burden of proof on the issue, as was the case at common law and as would be true even under the modern trend.

On the other hand, the statute does not require that the State prove that the precise act the officer is performing is not legally challengeable, i.e., that the arrest or search being effected is entirely lawful and beyond challenge. All that must be shown is that the officer is acting within the "scope of authority of a peace officer." In this respect, section 76-5-102.4 would appear from its plain language to reject the narrow common law approach endorsed in *Bradshaw* that authorized resistance if the arrest was unlawful in any particular and instead to have opted for an approach that, in operation, will be closer to the modern trend. Where the officer is not acting wholly outside the scope of his or her authority, the police action may not be resisted. The fine question of legality must be determined in subsequent judicial proceedings, not in the street. In interpreting the language "scope of authority," we find illustrative the Second Circuit's decision in *United States v. Heliczer,* 373 F.2d 241, 245 (2d Cir.1967). There, it stated that the test is whether an officer is doing what he or she was employed to do or is "engaging in a personal frolic of his [or her] own." *Id.*

Gardiner and Judge Bench argue that Gardiner should be acquitted because Hatzidakis was not acting within the scope of his authority when he conducted what was later determined to be an unlawful search. However, this position ignores the language of the statute in an attempt to reach a result the *Bradshaw* dictum would sanction.

■ Having isolated the legal standard, we must determine whether it was met here. We note that in cases involving mixed questions of fact and law where the judge makes a determination on contested facts, we view the evidence in the light most favorable to the trial court's ruling and reverse only if the necessary factual findings implicit in the court's ruling lack sufficient evidentiary support. *See Grayson-Roper Ltd. Partnership v. Finlinson,* 782 P.2d 467, 470 (Utah 1989); *State v. Walker,* 743 P.2d 191, 192-93 (Utah 1987); Utah R. Civ.P. 52(a). In reviewing the application of the law to those facts and findings, we apply a correctness standard and reverse if the legal standard is not satisfied. *Mountain Fuel Supply Co. v.*

*Salt Lake City Corp.,* 752 P.2d 884, 887 (Utah 1988); *Scharf v. BMG Corp.,* 700 P.2d 1068, 1070 (Utah 1985); *Margulies v. Upchurch,* 696 P.2d 1195, 1200 (Utah 1985).

Viewed in a light most favorable to the trial court, the facts are that Officer Hatzidakis responded to an anonymous phone call reporting a loud party at the Vernal Airport. He was in uniform and on duty at the time he responded to the call. Upon arrival at the scene, he informed Gardiner and others that he was a police officer and intended to search the building because he saw persons he believed to be minors consuming alcohol inside. When Hatzidakis informed Gardiner that he did not have a search warrant, Gardiner told the officer he could not enter and physically confronted the officer. The trial court found that Gardiner's "demeanor ... was hostile and threatening." At this point, Hatzidakis pushed Gardiner away from the door, and Gardiner fell onto a card table that crashed under his weight. We find these factual findings to have adequate evidentiary support in the record. Considering the circumstances Officer Hatzidakis faced at this point, we conclude that the trial court did not err in finding that the force used as a matter of law to pursue the search was "not excessive" and was "reasonable in view of the circumstances." Gardiner then got up from the ground, charged Hatzidakis, and hit him in the face, knocking him out of the building. The melee continued outside the building, even after Hatzidakis informed Gardiner he was under arrest. From these facts, it is clear that there is sufficient evidence to find that Gardiner was guilty of assaulting a peace officer under section 76–5–102.4 while that officer was attempting to conduct a search in the course of a criminal investigation and then effect an arrest.

Was the officer "acting within the scope of his authority as a peace officer"? We think the evidence is ample to support the trial court's conclusion that he was. The fact that his attempted search was later found to be unlawful does not divest him of his authority. *See United Heliczer,* 373 F.2d at 245.

■ Turning to the second count for which Gardiner was convicted, section 76–8–305 provides:

A person is guilty of a class B misdemeanor if he [or she] has knowledge, or by the exercise of reasonable care, should have knowledge, that a peace officer is seeking to effect a lawful arrest or detention of himself [or herself] or another and interferes with such arrest or detention by use of force or by use of any weapon.

Utah Code Ann. § 76–8–305 (Supp.1990). Without recounting the events that precipitated the brawl, it is clear that when Gardiner hit the officer the first time, he had violated section 76–5–102.4. It was after this punch and during the ensuing fight outside the building that Hatzidakis informed Gardiner that he was under arrest. The record is clear that Gardiner was aware of Hatzidakis's attempt to place him under arrest. In fact, after Hatzidakis informed him that he was under arrest, Gardiner contended that he was not and then proceeded to hit Hatzidakis again in the face. This evidence is sufficient to support a conviction under section 76–8–305. Gardiner points to the illegality of the underlying search as justification for his attacking and continuing to fight Hatzidakis. However, as noted above, this is not a sufficient ground to assault a peace officer.

■ Gardiner relies also on sections 76–2–405 and –406 as articulating a right to physically resist Hatzidakis's search. Section 76–2–405 gives a person the right to use reasonable force to "prevent" or "terminate" another's unlawful entry or attack upon his [or her] "habitation." That section states: "A person is justified in using force against another when and to the extent that he [or she] reasonably believes that the force is necessary to prevent or terminate the other's unlawful entry into or attack upon his [or her] *habitation* .... Utah Code Ann. § 76–2–405 (1990) (emphasis added). Because no place of habitation is involved here, only a place of business, by its terms section 76–2–405 has no application to our case.

As for section 76–2–406, it provides: "A person is justified in using force, other than deadly force, against another when and to the extent that he [or she] reasonably believes that force is necessary to prevent or terminate criminal interference with real property or personal property." Utah Code Ann. § 76–2–406 (1990). This section does permit the use of force to prevent a criminal interference with real property, and it could be construed to cover an illegal search of commercial premises. However, section 76–2–406 does not explicitly mention peace officers. For reasons common to sections 76–2–405 and –406, we conclude that that legislative silence indicates an intention that the actions of law enforcement officers taken within the course of their duties are not within the category of intrusions that may be lawfully resisted.

Both section 76–2–405 and section 76–2–406 were enacted in 1973 when the version of section 76–8–305 struck down by *Bradshaw* was still in force. That section made it illegal to resist arrest or detainment by a peace officer without regard to its legality. Thus, interpreting section 76–2–406 to include within its scope peace officers acting in the furtherance of their duty would bring section 76–2–406 into direct conflict with then-section 76–8–305. We conclude that the legislature intended section 76–2–406 and section 76–2–405 to exclude peace officers acting in the course of their duties from their operation.

The judgment is affirmed.

HALL, C.J., and DURHAM, J., concur.

STEWART, Justice (dissenting).

I join in Judge Bench's dissent and add the following comments. The majority opinion allows the State to charge a citizen who is physically attacked by a police officer for resisting an unlawful and unconstitutional act with the crimes of interfering with a police officer and assault on a police officer. Although the defendant fought back *after* the officer's initial attack, it is perfectly clear that the officer initiated the violence and then arrested the defendant for fighting back. The shocking consequence of the Court's ruling is that an officer seeking to conduct an unconstitutional search may physically attack a citizen and then charge that citizen with a crime for defending himself. The majority's holding that the police officer's conduct was within his "scope of authority" is plainly startling. To reach such an eccentric result, the Court ignores legislative intent expressed in an amendment to the assault statute, opts to follow what it says is the trend of cases, and simply ignores the constitutional right that the defendant was entitled to rely on.

The incident in this case was precipitated when a Vernal City police officer undertook a concededly unconstitutional search which the defendant resisted by placing his arm in a position to bar the doorway when he found the officer had no warrant. The officer then shoved the defendant backward with such force that he was thrown a distance of eight feet against a table that collapsed.

Gardiner was charged with and convicted of assault against a peace officer in violation of Utah Code Ann. § 76–5–102.4 (1990) and interfering with a peace officer in violation of Utah Code Ann. § 76–8–305 (1990). The bulk of the majority opinion is addressed to the question of whether a citizen has a common law defense of self-defense to unlawful action by a police officer. The majority does not give any weight to the fact that the officer initiated the violence. The majority and the trial courts try to tiptoe around the issue on the trial court's finding that the defendant initiated the violence because the defendant's "demeanor" was "hostile." Apparently citizens must be either meek when their rights are violated or suffer police-initiated violence. It is, of course, clear that if that conviction fails, the other conviction must also fail because the arrest would be unlawful, as Judge Bench states.

The key issue in this case, as Judge Bench points out, is whether the State proved the elements of the crime of assault on a police officer. The majority pays scant attention to the issue and deals with it in a most conclusory fashion. The legis-

lative history of the assault statute gives guidance in construing that provision. A 1987 amendment to that statute indicates a legislative intent to make an assault on an officer a crime only when the officer is acting within his or her authority. It is not enough to show that an officer was on duty and performing his duties. Prior to the 1987 amendment, the assault statute read:

> Any person who assaults a peace officer, with knowledge *that he is on duty,* is guilty of a class A misdemeanor.

Utah Code Ann. § 76-5-102.4 (1978) (emphasis added). The amendment made clear that being "on duty" was not sufficient. The amended statute now reads:

> Any person who assaults a peace officer, with knowledge that he is a peace officer, *and when the peace officer is acting within the scope of his authority as a peace officer,* is guilty of a class A misdemeanor.

Utah Code Ann. § 76-5-102.4 (1990) (emphasis added). Now, to constitute a crime, an assault must be directed against an officer who is acting "within the scope of his authority."

After Officer Hatzidakis announced his intention to enter the hangar to check for minors, Gardiner, who was in the building, told the officer his name and that his father owned the building. Gardiner asked Hatzidakis if he had a warrant, and the officer replied that he did not. Gardiner then told Hatzidakis he could not enter the building and stepped forward and extended his arm to block Hatzidakis's entry. No physical contact occurred between Gardiner and the officer when Gardiner blocked the doorway. At this point, the officer shoved Gardiner. The trial court found that Hatzidakis "perceived" Gardiner's action in blocking the doorway to be threatening and on that basis found that the officer's use of force was reasonable and not excessive. That finding is wrong; the fact

is undisputed that the officer initiated the first use of force and that force was clearly excessive.

The Fourth Amendment gives a citizen a right to refuse to consent to an entry and search. The assertion of that right cannot be a crime.[1] *Schneckloth v. Bustamonte,* 412 U.S. 218, 233, 93 S.Ct. 2041, 2050, 36 L.Ed.2d 854 (1973); *Camara v. Municipal Court,* 387 U.S. 523, 530-33, 87 S.Ct. 1727, 1731-33, 18 L.Ed.2d 930 (1967); *United States v. Prescott,* 581 F.2d 1343, 1351 (9th Cir.1978); *City of Middleburg Heights v. Theiss,* 28 Ohio App.3d 1, 4, 501 N.E.2d 1226, 1229 (1985). *See generally* 1 W. La-Fave, *Search and Seizure* § 1.13(b) (2d ed. 1987). Despite that law, the majority holds that the officer acted within the scope of his authority because he "responded to an anonymous phone call" to investigate a "loud party" and was "in uniform and on duty at the time he responded to the call." That is tantamount to saying that virtually anything an officer does is within his authority.

The better-reasoned cases reject that approach. The Idaho Court of Appeals, in *State v. Wilkerson,* 114 Idaho 174, 180, 755 P.2d 471, 477 (Idaho Ct.App.), *aff'd,* 115 Idaho 357, 766 P.2d 1238 (1988), construed a statute which used the phrase "duty of his office" and stated that the phrase includes "only those lawful and authorized acts of a public officer. To hold otherwise would clothe an officer with protection from resistance based only on his status as an officer and would render the [balance of the statute] mere surplusage." An illegal search by an officer cannot be within the officer's scope of authority. *People v. Swiercz,* 104 Ill.App.3d 733, 737, 60 Ill.Dec. 1, 2, 432 N.E.2d 900, 902 (1982), held that an officer's entry into an apartment without a warrant and without exigent circumstances to search for a suspect was not an "authorized act" which was required to

---

1. Gardiner's actions were in response to an illegal search, but many of the cases deal with an unlawful arrest. An illegal search may be as invasive as an unlawful arrest. *See, e.g., People v. Wetzel,* 11 Cal.3d 104, 113 Cal.Rptr. 32, 520 P.2d 416 (1974); *State v. Gallagher,* 191 Conn. 433, 465 A.2d 323 (1983). *See generally* 1 W.

LaFave, *Search and Seizure* § 1.13 (2d ed. 1987). Furthermore, a person cannot be convicted of a crime for failing to obey a police officer's order if that order is violative of the United States Constitution. *Wright v. Georgia,* 373 U.S. 284, 291-92, 83 S.Ct. 1240, 1245, 10 L.Ed.2d 349 (1963).

support a conviction for obstructing a police officer. In *State v. Hauan*, 361 N.W.2d 336, 339–40 (Iowa Ct.App.1984), the court ruled that an officer who exceeded the scope of a search warrant was not engaged in his "official duties" and, therefore, the defendant was not guilty of interference with official acts. In my view, the officer's use of force in executing an illegal search in this case was not within the scope of his authority. Even if the law were otherwise, it is beyond question that an officer who physically attacks a citizen for refusing to consent to an illegal search is patently beyond his authority.

The majority asserts the position, also expressed in Justice Ellett's dissent in *State v. Bradshaw*, 541 P.2d 800, 805–06 (Utah 1975), that procedural safeguards are sufficient to protect the rights of those who are unlawfully arrested. In my view, that position is unrealistic. One author has observed that "such protections are realizable only if the defendant has some reliable way of showing that the police acted unconstitutionally." Chevigny, *The Right to Resist an Unlawful Arrest*, 78 Yale L.J. 1128, 1134–35 (1969). The remedies the majority relies on to justify denying a citizen the right to resist unlawful conduct are of little value. A citizen who must endure a stay in jail and the expense of posting bail and obtaining an attorney is simply doubly wronged. Empirical studies show that administrative review of police abuse is ineffectual as a remedy for police misconduct; civil damages are inadequate because an "action may take several years, and the plaintiff may have a difficult time finding a lawyer willing to spend the necessary time on his case unless he has been injured badly enough to give rise to large damages." *Id.* at 1135–36.

The majority opinion abolishes the right of a citizen to use reasonable force to resist an unlawful act by a police officer and holds that the criminal code does not provide for a defense of reasonable resistance to unlawful police conduct. This construction of the criminal code is erroneous. The majority states that "the enactment of ... specific and varied defenses and the failure to enact any general illegality defense ...

impliedly preclude[s] us from finding any generally available common law right to resist...." In essence, the majority concludes that only statutorily defined defenses are available in Utah. The code does not purport to state the only allowable defenses. For example, in *State v. Sessions*, 645 P.2d 643 (Utah 1982), we recognized a defense not then found in the code, although that defense is now contained in the code. Furthermore, everyday practice and common sense disprove the majority's casual assertion that only statutory defenses are recognized in Utah. For example, former jeopardy is a constitutional defense not mentioned in that part of the code dealing with affirmative defenses. Beyond doubt, that defense is, and must be, recognized in Utah.

The majority's position is unsupported by any authority from a state which has adopted the Model Penal Code and is simply incorrect. The current criminal code was adopted from the Model Penal Code. The commentaries to the Model Penal Code state:

> The status of common law defenses ... is not entirely clear. Of the jurisdictions that have enacted or proposed revised penal codes since promulgation of the Model Penal Code, six have specifically retained common law defenses. Five of these are jurisdictions that have abolished or would abolish common law offenses; one jurisdiction, Florida, has explicit provisions retaining both common law offenses and common law defenses.... Only the proposed code of Maryland specifically abolishes common law defenses.

> Even some of those enacted and proposed codes that explicitly state that defenses shall be governed by their provisions may not be entirely clear with respect to common law defenses. While such provisions would appear to be limiting defenses to those provided by the code, two that state that the code "shall govern ... the construction and application of any defense ...," specifically retain common law defenses.

Model Penal Code § 1.05 comment 5, at 82–83 (Official Draft and Revised Comments 1985) (footnotes omitted). The comment notes that although adoption of the Model Penal Code "should render common law defenses unnecessary," the issue is dependent on the nuances of the code in each jurisdiction, and the "significance of common law defenses would be greater" in some jurisdictions. *Id.* at 83 & n. 53.

I submit that a citizen should have the right to resist, in a reasonable manner, acts that are clearly unlawful. Although fine points of law ought not to be a spark for violent confrontations, the law ought to favor the citizen against clearly unconstitutional conduct, most especially when an officer initiates violence and uses excessive force. "The purpose of the right is not to encourage violent attacks on policemen, but to preserve the sense of personal liberty inherent in the right to reject arbitrary orders." Chevigny, *The Right to Resist an Unlawful Arrest,* 78 Yale L.J. 1128, 1150 (1969).

BENCH, Court of Appeals Judge (dissenting).

When all is said and done, the majority recognizes that this is a case of statutory construction. I dissent because I disagree with the majority's construction of the statutes Gardiner was accused of violating.

In construing a statute, the primary focus should be on the statutory text, the words employed by the Legislature to express its intent, because "the best indication of legislative intent is the statute's plain language." *Berube v. Fashion Centre, Ltd.,* 771 P.2d 1033, 1038 (Utah 1989). Thus, "[w]here statutory language is plain and unambiguous, this Court will not look beyond to divine legislative intent. Instead, we are guided by the rule that a statute should be construed according to its plain language." *Allisen v. American Legion Post No. 134,* 763 P.2d 806, 809 (Utah

1988); *see also Brinkerhoff v. Forsyth,* 779 P.2d 685, 686 (Utah 1989).

However, rather than taking the statutory text as its starting point, the majority begins by dusting off what it admits is an obsolete common law defense in order to kill an already dead letter, noting along the way the evils of self-help. Whatever those evils may be, they are not the point. The real issue in this case is whether the Legislature intended Gardiner's conduct to be a criminal offense. The majority roams far afield from what the Legislature clearly said, perhaps because the Legislature quite plainly intended a result different from that which the majority strains to accomplish.

SECTION 76–5–102.4

Utah Code Ann. § 76–5–102.4 (1990) escalates the penalty for assault, ordinarily a class B misdemeanor, to a class A misdemeanor when the defendant has "assault[ed] a peace officer, with knowledge that he is a peace officer, and when the peace officer is acting within the scope of his authority as a peace officer." By the plain meaning of these words, the Legislature did not intend them to encompass a peace officer performing clearly illegal activity, such as the illegal search and the unnecessary use of force in this case.[1] However, the majority concludes that an illegal search is within the scope of a peace officer's authority. *Cf. State ex rel. Hurley,* 28 Utah 2d 248, 501 P.2d 111 (1972). It seems highly implausible that the Legislature considered peace officers to have authority to do illegal acts.

I also do not believe that the Legislature intended to subvert the fourth amendment by including within the "scope of [a peace officer's] authority" the power to perform clearly unreasonable searches. The right "to be secure in their persons, houses, papers, and effects, against unreasonable searches" means more than simply the right to exclude at trial illegally obtained

---

**1.** Gardiner argues that the search in this case was unlawful. The State does not refute that argument, and the majority notes "its acceptance of the Court of Appeals' conclusion that Officer Hatzidakis's search of the building was

illegal." Accepting the facts as stated by the majority, it seems strikingly obvious that the search in this case violated the fourth amendment.

evidence. The fourth amendment was intended as a limitation on governmental power.[2] The exclusion of evidence is merely one of the means for effecting that limitation. *See Weeks v. United States,* 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914). By concluding that performing a clearly illegal search was within the scope of Officer Hatzidakis's authority, the majority severely undermines the right to be secure from unreasonable searches. Instead of undermining the Constitution, the majority should follow the statute's plain meaning, which is in harmony with the Constitution. *See Chris & Dick's Lumber & Hardware v. Tax Comm'n,* 791 P.2d 511, 516 (Utah 1990).

The only support the majority offers in explaining away the scope-of-authority wording of section 76-5-102.4 is *United States v. Heliczer,* 373 F.2d 241, 245 (2d Cir.1967), which upheld the conviction of a bystander who resisted an *arrest* that the jury found to be *lawful* as a citizen's arrest under New York law. *Heliczer*'s dicta criticizing the common law right to resist an unlawful arrest within the scope of a peace officer's authority are an extremely weak basis for explaining away the plain meaning of the Utah statute increasing the penalty for assault only if the victim is "a peace officer acting within the scope of his authority." *Obiter* remarks from another jurisdiction in another factual context are no basis to interpret "[u]nambiguous language in [a] statute ... so as to contradict its plain meaning." *Bonham v. Morgan,* 788 P.2d 497, 502 (Utah 1990); *Johnson v. Utah State Retirement Bd.,* 770 P.2d 93, 95 (Utah 1988).

Thus, the majority contradicts the plain meaning of the Utah statute by including within the "scope of [a peace officer's] authority" the power to conduct illegal searches in violation of the fourth amendment.

**2.** Drawing from their experience under British colonial rule, the framers sought to ensure that general warrants and writs of assistance would have no place in the new government. *See State v. Rowe,* 806 P.2d 730, 740–42 (Utah Ct. App.1991) (explaining development of the exclu-

## SECTION 76–8–305

Gardiner was also convicted of interfering with a lawful arrest in violation of Utah Code Ann. § 76-8-305 (1990), which provides:

> A person is guilty of a class B misdemeanor if he has knowledge or by the exercise of reasonable care, should have knowledge that a peace officer is seeking to effect a lawful arrest or detention of himself or another and interferes with such arrest or detention by use of force or by use of any weapon.

The State recognizes that the principal difficulty in applying this section to Gardiner is the phrase requiring "knowledge that a peace officer is seeking to effect a lawful arrest or detention of [the defendant] or another." Gardiner argues that his arrest was not lawful, and the State essentially conceded that point in oral argument and asked us to avoid considering the lawfulness of the arrest. Nevertheless, the majority proceeds to affirm Gardiner's conviction under this section without ever confronting the question whether Gardiner knew that Officer Hatzidakis was "seeking to effect a lawful arrest." Gardiner's position has been that the arrest was not lawful; in his mind, he was resisting an *un-lawful* arrest, an act which section 76-8-305 does not penalize. Since the State concedes this point, it has not established a violation of section 76-8-305, and Gardiner's conviction under that section should be reversed. *See Hurley,* 28 Utah 2d 248, 501 P.2d 111 (reversing a conviction for interfering with an arrest by an officer exceeding the duties of his office).

## CONCLUSION

I would hold that the officer was not acting "within the scope of his authority" for purposes of section 76-5-102.4 and would accordingly reverse Gardiner's conviction under that section. I would also

sionary rule); Stewart, *The Road to Mapp v. Ohio and Beyond: The Origins, Development and Future of the Exclusionary Rule in Search and Seizure Cases,* 83 Colum.L.Rev. 1365, 1369 (1983).

reverse his conviction under section 76–8–305 because, as the State concedes, Gardiner was not knowingly interfering with a peace officer "seeking to effect a lawful arrest." Since the State fails to establish a prima facie case under either statute, I see no need to consider defenses that could apply.

Finally, and with hindsight, I agree with the majority's comment that the Court of Appeals should have published its opinion in this case. In my view, publication of appellate opinions serves essentially two important purposes: It records and disseminates the development of the common law,[3] and it enables the public to monitor the quality of appellate judicial service.[4] However, some cases coming before a court hearing appeals as of right do not present issues that could enhance the development of the common law, and publication of the greater part of an Appellate Court's decisions provides an adequate sampling of Judicial performance. If a particular case has negligible value as precedent, the parties are better served by dispensing with publication and the greater delay it necessitates.

HOWE, Associate C.J., does not participate herein.

BENCH, Court of Appeals Judge, sat.

---

**3.** M. Eisenberg, *The Nature of the Common Law* 4–5 (1988).

**4.** K. Llewellyn, *The Bramble Bush* 81 (rev. ed. 1950).