**SALT LAKE CITY, a municipal corporation, Plaintiff and Appellee,**

v.

**Donald Phillip SMOOT, Defendant and Appellant.**

No. 950550–CA.

Court of Appeals of Utah.

June 20, 1996.

Certiorari Denied Sept. 26, 1996.

Lynn C. Harris, Salt Lake City, for Appellant.

Virginia B. Ward, Salt Lake City, for Appellee.

Before GREENWOOD, JACKSON and WILKINS, JJ.

## OPINION

GREENWOOD, Judge:

Defendant Donald Phillip Smoot appeals his jury conviction on one count of Interfering with an Officer, a violation of Salt Lake City Code § 11.04.030 (1989). Defendant argues that the police had no right to run a warrants check on him and that the jury was improperly instructed. We affirm.

## BACKGROUND

In January of 1994, a series of armed robberies occurred at several downtown bars and restaurants in Salt Lake City. Defendant testified that he had become concerned about these robberies because he was a resident of the area and had friends who worked in nearby bars and restaurants. Because of his concern, defendant began a personal investigation into the robberies. In furtherance of this pursuit, defendant testified he visited some of his favorite downtown establishments, asking questions about the robberies.

Late in the evening of January 29, employees and patrons of the Cinema Bar/Spanky's (Spanky's), a bar and private club in downtown Salt Lake City, were discussing the recent robberies, including one that had occurred a few hours earlier. Defendant joined in this conversation. Spanky's owner, Jason Brooks, became suspicious of defendant because he was asking a lot of questions and seemed to have information about the robberies that was not general knowledge. Brooks called the police to report his suspicion.

Officer Jeff Payne of the Salt Lake Police responded to the call at approximately 12:45 a.m. and spoke with Brooks at Spanky's. At this point defendant was no longer at Spanky's, having walked half a block down the street to the Zephyr, another downtown private club. Officer Payne then walked to the Zephyr to search for the as-yet-unidentified suspicious person. Officer Payne was unable to locate the suspect in the crowded club and decided to leave. As Officer Payne was leaving, Officer David Warner, who had responded as backup, told him that the suspect had been located. The officers were able to locate defendant with the assistance of a Zephyr patron, Ramon Cardenas. Cardenas went into the Zephyr, found defendant, and asked him to come outside and speak with the police.

Defendant voluntarily left the Zephyr and came outside to talk to Officers Warner and Payne. Officer Payne asked defendant for identification, which he provided, and gave it to Officer Warner who stepped aside to call in a warrants check on defendant with his hand-held radio. While Officer Warner ran the warrants check, Officer Payne continued questioning defendant. Up to this point, there is no suggestion that the encounter was other than consensual.

According to various testimony, Officer Payne questioned defendant for five to twenty minutes while Officer Warner conducted the warrants check. Officer Warner then informed Officer Payne that defendant had several outstanding bench warrants. The officers discussed the warrants briefly and decided to serve them. The officers then informed defendant they were going to serve the warrants.

Although the various accounts of what happened next differ in some of the details, they are substantially in agreement on the salient facts. When the officers told defendant they planned to serve the warrants, he responded angrily, stating either "no you're not" or "screw this." He then turned around and began to leave. As he turned, defendant, either intentionally or inadvertently, came into physical contact with the officers. Defendant took only a few steps before the officers grabbed him and pulled him to the ground. Defendant continued to struggle and kept pushing up, attempting to escape. Finally, unable to subdue defendant, Officer Warner struck him two or three times in the head, at which point defendant stopped struggling and allowed himself to be handcuffed. Officer Payne called for an ambulance and more backup. Defendant was transported to the hospital for treatment of injuries he received during the struggle, and then booked into jail.

Defendant was charged with three criminal violations of Salt Lake City Ordinances: Interfering with an Officer, a class B misdemeanor; Disturbing the Peace, an infraction; and Public Intoxication, a class C misdemeanor. Defendant filed a motion to suppress, challenging the legality of his detention and arrest. The trial court denied the motion. On the first day of trial, on the City's motion, the trial court dismissed the charge of Disturbing the Peace. A jury found defendant guilty of Interfering with an Officer but not guilty of Public Intoxication. Defendant now appeals.

## ISSUES ON APPEAL

Defendant raises three issues on appeal: (1) did the trial court err in determining that the officers acted lawfully in conducting the warrants check; (2) did the trial court err in refusing to give certain of defendant's proposed jury instructions; and (3) was the instruction given by the court regarding resisting arrest correct.

## STANDARDS OF REVIEW

■ The trial court's determination regarding reasonable suspicion is reviewed for correctness, affording a measure of deference due to the fact-specific nature of the inquiry. *State v. Chapman,* 921 P.2d 446, 449 (Utah 1996); *State v. Pena,* 869 P.2d 932, 939 (Utah 1994); *see also Ornelas v. United States,* —— U.S. ——, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996) (holding legal determination of reasonable suspicion is reviewed de novo whereas underlying facts are reviewed for clear error).

■ We review the trial court's instructions to the jury for correctness, affording no deference. *Ames v. Maas,* 846 P.2d 468, 471 (Utah App.1993). When conducting this analysis, we review the instructions in their entirety to determine whether the instructions, when considered as a whole, fairly instruct the jury on the applicable law. *Id.* "We reverse a trial court's decision on the basis of an instruction improperly submitted to the jury only where the party challenging the propriety of the instruction 'demonstrates prejudice stemming from the instructions viewed in the aggregate.'" *Id.* (quoting *State v. Haston,* 811 P.2d 929, 931 (Utah App.1991), *rev'd on other grounds,* 846 P.2d 1276 (Utah 1993)).

## ANALYSIS

### Propriety of the Warrants Check

■ Defendant argues that the police's detention of him exceeded the bounds of a *Terry* stop and thus violated the laws of this state and the state and federal constitutions.[1]

We disagree. Under *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and its progeny, there are three levels of police-citizen encounters, each requiring a different degree of justification under the Fourth Amendment. *State v. Munsen,* 821 P.2d 13, 15 n. 1 (Utah App.1991), *cert. denied,* 843 P.2d 516 (Utah 1992). The first level occurs when an officer approaches and questions a suspect. An officer may stop and question a person at any time so long as that person "is not detained against his [or her] will." *Id.* The next level is reached when an officer temporarily seizes a person. In order to legally effect a temporary seizure, the officer must have "articulable suspicion" that the suspect has or is about to commit a crime, and the detention must be limited in scope. *Id.* The third level is arrest, which requires probable cause for the officer to believe that a crime has been or is about to be committed. *Id.*

Both parties agree that the initial encounter between the officers and defendant was entirely consensual. However, at some point the encounter escalated from a purely consensual police-citizen encounter to a level-two *Terry* stop, and then proceeded onward to become a level-three arrest. Defendant specifically challenges the escalation of the encounter from a level-one to a level-two *Terry* stop, arguing that the police had no "articulable suspicion" of him and that, even if they did, the seizure lasted longer and was more invasive than necessary.

It is not critical to pinpoint the precise moment at which defendant was "seized" for purposes of the Fourth Amendment because, even if we assume that the encounter was at no time consensual, the officers still had a right to question defendant due to the information given to them by Brooks, the owner of Spanky's. Brooks's complaint potentially connected defendant with a series of unsolved armed robberies. We believe this information, as a matter of law, gave the officers articulable suspicion of criminal activity sufficient to detain defendant for a limited

---

**1.** Because defendant has not articulated any meaningful argument for a different state constitutional analysis, we decline to analyze his claim separately under the Utah Constitution. *See State v. Roth,* 827 P.2d 255, 257 n. 5 (Utah App.1992).

period of time. *See State v. Chapman,* 921 P.2d 446, 449 (Utah 1996).

■ Having determined that the police questioning of defendant was justified at its inception, the next determination is whether the continued detention of defendant, and the concomitant running of a warrants check, was " ' "reasonably related in scope to the circumstances that justified the interference in the first place." ' " *Id.* (quoting *State v. Lopez,* 873 P.2d 1127, 1131 (Utah 1994) (quoting *Terry,* 392 U.S. at 19–20, 88 S.Ct. at 1879)). We believe that it was. In *Chapman,* the supreme court highlighted the analysis in its prior decision in *Lopez,* as the proper framework for conducting this scope of detention analysis. *Chapman,* 921 P.2d at 450.

■ In *Lopez,* the court stated that once a stop is made, the detention "must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *Lopez,* 873 P.2d at 1132 (citations omitted). With respect to a warrants check, the *Lopez* court noted that running a warrants check does not exceed the scope of detention "so long as it does not significantly extend the period of detention beyond that reasonably necessary to request a driver's license and valid registration and to issue a citation." *Id.* at 1133. While *Lopez* was decided in the context of a routine traffic stop, *Chapman* clarifies that the same principles apply equally in other contexts. *Chapman,* 921 P.2d at 450; *see also* 4 Wayne R. LaFave, Search and Seizure, § 9.2(f), at 51–58 (1996) (noting use of warrants check is not "inherently objectionable" but may cast doubt on reasonableness of detention if its use makes period of detention "unduly long"). Accordingly, our analysis focuses on whether the officers' continued detention of defendant while running a warrants check significantly extended the period of his detention beyond that rea-

sonably necessary to effectuate the purpose of the initial stop.

We begin with the purpose of the encounter. The purpose of questioning defendant was to investigate a citizen's suspicion that he might have some connection to a series of armed robberies. Defendant argues that the police had no reasonable suspicion regarding him because the suspect in the robberies had been described as a short, black male, while defendant was a tall, Caucasian male. Furthermore, defendant argues that the police had other less intrusive means at their disposal to dispel any doubts about him. We disagree.

■ The fact that there was an extant description of a suspect does not rule out the possibility that other persons might have been involved, that the description was inaccurate, or the possibility that defendant had some other improper interest in the robberies. Furthermore, a warrants check is a useful and efficient weapon in the standard police arsenal for dealing with suspicious persons. *See Lopez,* 873 P.2d at 1133 (noting impact of warrants check upon scope of detention is minimal due to efficiency of computerized data storage while governmental interest in arresting citizens with outstanding warrants is substantial). The warrants check in this case took as few as five minutes, and at most twenty minutes, which is not a significant amount of time.[2] Moreover, Officer Payne was actively questioning defendant the entire time Officer Warner was running the warrants check. There is no indication in the record, nor any allegation by defendant, that Officer Payne was merely biding his time waiting for the results of the warrants check. Therefore, the running of the warrants check did not increase the period of defendant's detention significantly, if at all. Accordingly, we hold that the warrants check was conducted in an unobjectionable manner and that the trial court's denial of defendant's motion to suppress was correct.

2. Defendant testified that the police questioned him for fifteen to twenty minutes, while all other witnesses testified to substantially lesser periods. According to the police dispatcher, Officer Payne arrived at Spanky's at 12:47 and called for an ambulance at 1:15. This leaves a total of twenty-eight minutes. Subtracting from this the time it took Officer Payne to walk to the Zephyr and look for defendant, to walk back to his vehicle, to return to the Zephyr after defendant had been located, and the time of the actual physical confrontation, suggests that twenty minutes is surely the maximum time involved and a lesser figure is more probable.

## Jury Instructions

██ Defendant argues that the trial court erred in refusing to submit three of his proposed instructions to the jury, and further erred in the formulation of its own alternative instruction. Defendant's proposed instructions dealt with his alleged right to resist arrest when the police use excessive force. Specifically, defendant's proposed instructions stated as follows:

[1] You are instructed that an officer is acting within the scope of his authority of a police officer in conducting any arrest unless you find that the force used to conduct the search was excessive or was not reasonable in view of the circumstances.

[2] You are instructed that a citizen may not use force to resist any arrest unless the officer uses excessive force.

[3] You are instructed that conduct which is justified is a defense to prosecution for any offense based on the conduct. The defense of justification may be claimed:

(1) When the act of [sic] conduct is in defense of persons or property under the circumstances described in Sections 76–2–402 thru 76–2–406.

(2) When the actor's conduct is justified for any other reason under the laws of this state.

You are further instructed that § 76–2–402(1) of the Utah Code of Criminal Procedure provides. "A person is justified in threatening or using force against another when and to the extent that he or she reasonably believes that force is necessary to defend himself or a third person against such other's imminent use of unlawful force." [3]

The trial judge refused to submit these instruction to the jury, and, instead, submitted the following instructions:

Instruction 13: You are instructed that an arrest is an actual restraint of the person arrested or submission to custody. *The person shall not be subjected to any more restraint than is necessary for his arrest and detention.*

Instruction 15: Under our law, a person may not lawfully resist an arrest initiated by a peace officer taken within the course of the officer's duties. *Where the officer is not acting wholly outside the scope of his or her authority, the police action may not be resisted.*

(Emphasis added). Defendant argues that the trial court's instructions deprived him of the opportunity to present his theory of the case to the jury, misconstrued the law of this state, and were unnecessarily difficult to comprehend. The City counters that the trial court's refusal to submit defendant's proposed instructions was proper because they were incorrect statements of law. The City further argues the trial court's alternate instructions were legally correct, and that, in any case, the instructions, when considered in the aggregate and combined with voir dire questioning and opening and closing statements, gave defendant ample opportunity to present his theory of the case to the jury.

 We begin by noting that defendant is correct in his assertion that he is entitled to have his theory of the case presented to the jury " 'in a clear and understandable way.' " *State v. James,* 819 P.2d 781, 798–99 (Utah 1991) (quoting *State v. Potter,* 627 P.2d 75, 78 (Utah 1981)). However, defendant is not entitled to an instruction which "does not comport with the facts presented or does not accurately state the applicable law." *Id.* at 799. Furthermore, "the trial court does not err in refusing to give a requested instruction if the point is properly covered in other instructions presented to the jury." *Id.* Defendant asserts that the facts of this case warranted his specific instructions and that the instructions are a reasonable interpretation of the Utah Supreme Court's opinion in *State v. Gardiner,* 814 P.2d 568 (Utah 1991). While *Gardiner* addressed slightly different facts and law than the present appeal, it is still the leading Utah case on the right to forcibly resist the exercise of unlawful police authority. We therefore analyze it at some length.

*Gardiner* addressed the question of whether a person is entitled to forcibly resist an

---

**3.** Having never been submitted to the jury, defendant's instructions were unnumbered. For sim-
plicity we will refer to them as numbers one, two and three as numbered in this opinion.

illegal police search. The defendant, Gardiner, was hosting a late-night party in a building owned by his father at the Vernal City Airport. *Id.* at 569. When the police arrived to investigate an anonymous complaint of a loud party where minors were consuming alcohol, Gardiner asked the officer for a search warrant. Upon finding that the officer had no warrant, Gardiner told the officer that he could not enter and stepped forward, extending his arm to block the doorway. *Id.* The officer pushed Gardiner and he fell backwards. Gardiner got up and punched the officer in the face, knocking him out of the building. Outside, the struggle continued between Gardiner and three officers. Gardiner was informed that he was under arrest, but continued fighting, again striking the officer in the face. He was ultimately subdued and jailed. *Id.* Gardiner was found guilty of one count of assaulting a peace officer and one count of interfering with a peace officer. *Id.* at 570.

On appeal, this court, in an unpublished decision, determined that the police's search of the building was illegal, but affirmed Gardiner's conviction. This court followed the Alaska Supreme Court's decision in *Elson v. State*, 659 P.2d 1195 (Alaska 1983), which held that a person may only resist arrest if the officer was not acting pursuant to his or her authority or was using excessive force. *Gardiner*, 814 P.2d at 570.

On writ of certiorari, the supreme court affirmed the result reached by this court, but upon different grounds. After reviewing the common law history of the right to resist arrest and the law of other states, the court indicated that:

> "were we free to do so, we would be inclined to reject the English common law [4] and adopt the diluted defense to an illegal search or arrest articulated in *Elson* and similar decisions. However, we conclude that we are not free to fashion such a rule because the legislature has already acted in the area."

*Id.* at 573 (footnote added). In reaching this decision, the court distinguished its earlier opinion in *State v. Bradshaw*, 541 P.2d 800 (Utah 1975), noting that any indication in *Bradshaw* that there was a constitutional right to resist arrest was dicta. *Gardiner*, 814 P.2d at 572.

Instead, the *Gardiner* court based its decision upon implied legislative preclusion. The court noted that the Utah Legislature has abolished all common law crimes. *Id.* at 573 (citing Utah Code Ann. § 76–1–105 (1973)). Similarly, the legislature has enacted both general and specific statutory *defenses*. *Id.* at 574 (citing Utah Code Ann. §§ 76–2–401 to –406 (1990)). These enumerated statutory defenses do not include any right to resist an illegal search or arrest. *Id.* Based upon this omission, the court determined that it was impliedly precluded from creating or recognizing any common law right to resist arrest, and therefore, any right to resist arrest "must be *grounded in the specific code sections under which [defendant] was convicted.*" *Id.* (emphasis added).

Having reached this point in its analysis, the *Gardiner* court analyzed the specific code section under which Gardiner had been charged. That section stated:

> Any person who assaults a peace officer, with knowledge that he [or she] is a peace officer, *and when the peace officer is acting within the scope of his [or her] authority as a peace officer,* is guilty of a class A misdemeanor.

Utah Code Ann. § 76–5–102.4 (1990) (emphasis added). The court determined that the only language in this section which could possibly be construed as providing a right to resist arrest is the emphasized "scope of authority" language. *Gardiner*, 814 P.2d at 574.

Based upon this language, the court concluded: "Where the officer is not acting wholly outside the scope of his or her authority, the police action may not be resisted." [5] *Id.* The supreme court then went on to embrace the Second Circuit's test for determining the scope of authority: "[T]he test is

---

4. Under the English common law there was a right to forcibly resist an illegal arrest.

5. This is the language upon which the trial court relied in fashioning instruction 15, to which defendant objects.

whether an officer is doing what he or she was employed to do or is 'engaging in a personal frolic of his [or her] own.'" *Id.* (quoting *United States v. Heliczer*, 373 F.2d 241, 245 (2d Cir.1967)). Having thus determined the legal standard to be applied, the court reviewed the trial court's findings and conclusions. *Id.* at 574–75. The court concluded that the trial court did not err in finding that the force used by the police was "not excessive" and "reasonable in view of the circumstances." *Id.* at 575.

Relying upon this language, defendant asserts that *Gardiner* stands for the proposition that the use of excessive force is, as a matter of law, outside the scope of an officer's authority. Defendant incorporated this language into his proposed instruction number one. However, our reading of *Gardiner* is not so definitive. In the process of applying the rule of law formulated in *Gardiner*, the supreme court implies that the use of excessive force or actions that are unreasonable under the circumstances might place the officers outside the scope of their authority, thus justifying resistance. That conclusion, however, is not entirely consistent with the court's earlier observation that it is not free to adopt the common law defenses allowing resistance to an illegal search or arrest.

Furthermore, nowhere does *Gardiner* expressly state that the use of excessive force is outside the scope of an officer's authority thereby justifying resisting arrest. Rather, the court focused on facts such as whether or not the officer was in uniform and on duty, whether the defendant knew he or she was an officer, and whether the defendant knew that he or she was being arrested. *Id.* This seems to indicate that the officer's authority is not based upon the amount of force used, but rather upon the more objective indicia of how the officer is perceived. Also, because the trial court in *Gardiner* specifically found that no excessive force was used and that the

force used was "reasonable in view of the circumstances," a finding that the supreme court noted was supported by the evidence, the supreme court did not need to reach the specific issue of whether or not the use of excessive force would have justified Gardiner's resisting arrest.[6]

The crux of the foregoing discussion is that we are not persuaded that defendant's requested instructions are correct statements of the law under the *Gardiner* opinion. However, even assuming defendant is correct, we believe that the trial court adequately instructed the jury in this case.

■ At least one of defendant's proposed instructions was incorrect. Defendant's proposed instruction three, dealing with the justification defenses found in title 76 of the Utah Code, was specifically rejected in *Gardiner*. *Gardiner* noted that the legislature intended to exclude peace officers acting in the course of their duties from the scope of these defenses based upon justification.[7] *Id.* at 576. Furthermore, *Gardiner*'s determination that the legislature had impliedly precluded the adoption of a common law right to resist arrest was premised upon the conspicuous lack of any statutory right to resist illegal police conduct. *Id.* at 574. Therefore, the statutory justification defenses found in sections 76–2–401 to 406 of the Utah Code do not apply to claims of resisting arrest and the trial court did not err in refusing to give this instruction.

■ As noted previously, any right to resist arrest must stem from the statute in question. *Id.* In this case, the City charged defendant under Salt Lake City Code section 11.04.030. This ordinance reads, in relevant part:

Every person shall be guilty of a misdemeanor who:

---

6. Defendant argues that the trial court should have made a specific finding as to whether excessive force was used; however, since defendant failed to request such a finding below, he has waived any objection to its omission. *See State v. Eldredge*, 773 P.2d 29, 34–35 (Utah), *cert. denied*, 493 U.S. 814, 110 S.Ct. 62, 107 L.Ed.2d 29 (1989) (refusing to consider issue where party failed to request necessary findings).

7. The defenses found in title 76 justify the use of force against another person in certain limited circumstances, including the defense of a person's dwelling, person or property. *See* Utah Code Ann. §§ 76–2–401 to –406 (1995).

A. Attempts by means of any threat, force or violence to deter, interfere with or prevent a police officer ... from performing any official duty imposed upon such officer ... by law; or

B. Wilfully resists, physically delays or physically obstructs a police officer ... or fails to comply with a lawful command of a police officer ... in the discharge or attempt to discharge any official duty of such officer; or

C. Knowingly resists by the use of force or violence any police officer ... while performing an official duty.

Salt Lake City Code § 11.04.030 (1989). Under the *Gardiner* analysis, the issue under this city ordinance is whether the officers were "performing" or "discharging" an "official duty." [8] Rather than proceeding under the language of this ordinance, however, the trial court fashioned its own instruction based upon the "scope of authority" language in *Gardiner* taken from Utah Code Ann. § 76–5–102.4 (1990), which deals with the crime of assault upon a police officer. *See Gardiner*, 814 P.2d at 574.

■ Nonetheless, both parties accepted and do not challenge the trial court's use of this statute, and neither party asserts there is any substantive difference between "performing" or "discharging" an "official duty" under the ordinance and "acting within the scope of his [or her] authority" under the statute. As the supreme court noted, the basic inquiry is whether the officer is "doing what he or she was employed to do or is 'engaging in a personal frolic of [his or her] own.'" *Id.* (citation omitted). Central to this inquiry are questions as to whether the officer was on duty, in uniform, and pursuing official police business. *See id.* at 575.

■ There is no indication in this case that the police were doing anything other than diligently pursuing an official police investigation. Furthermore, even if we assumed that the officers had no legal grounds for arresting defendant, he still would not have been justified in resisting arrest.

*Gardiner* makes clear that the mere illegality of a police action does not justify resisting arrest: "[Q]uestion[s] of legality must be determined in subsequent judicial proceedings, not in the street." *Id.* at 574. Therefore, while the instruction as taken from *Gardiner* may be less than crystal clear, it did properly focus the jury on the central inquiry of whether or not the officers were acting within the boundaries of their authority as peace officers.

More importantly, the court's other instruction, number thirteen, was a direct quotation of Utah Code Ann. § 77–7–1 (1995), and correctly instructed the jury that the person under arrest "shall not be subjected to any more restraint than is necessary for his arrest and detention." In the aggregate, these two instructions adequately informed the jury of the law and allowed defendant to pursue his theory of the case. *See James*, 819 P.2d at 799 (noting a defendant is not entitled to redundant instruction where point is adequately covered in other instructions).

■ We also observe that defendant had ample opportunity to inform the jury of his self-defense theory. During voir dire, the trial judge allowed extensive questioning of the venire panel as to their beliefs regarding the use of excessive force by police officers. In fact, the court allowed defendant so much latitude that the prosecutor requested a mistrial. Additionally, defendant was also allowed significant latitude in his closing statement, again engendering objections from the prosecution. Considered in the aggregate and in tandem with these significant opportunities to reach the jury, the instructions given allowed defendant to fully present his theory of the case to the jury.

Finally, it is questionable whether the facts of this case even warranted an instruction about defendant's right to resist arrest. All testimony in the record, including that of defendant, indicates that no force whatsoever was used against defendant until he attempt-

---

8. The City argues that only subsection C of this ordinance was discussed at trial. However, the City fails to provide any citations to the record and we are unable to determine if this was, in fact, true. In any case, because all of the sections refer to an officer's "official duty" we do not believe it is critical to determine which precise subsection was at issue.

ed to evade arrest by fleeing. It also appears that defendant's injuries were the result of his own action in struggling against the officers.[9] Unlike the facts in *Gardiner* where the officer was conducting an illegal search and was the initial aggressor, in the instant case, the officers had every right to arrest defendant because of his outstanding warrants, and there is no indication that force would have been used had he cooperated. In fact, *Gardiner* seems to indicate that when a defendant is aware of an officer's attempt to place him under arrest, *any* subsequent use of force by a defendant is sufficient to sustain a conviction for resisting arrest. *Gardiner,* 814 P.2d at 575.

## CONCLUSION

Because the police were investigating a citizen's report of a suspicious person, they were justified at the inception in detaining defendant. Furthermore, their use of a warrants check was unobjectionable because it was reasonable in light of the circumstances and did not excessively prolong the encounter. While the trial court may have erred to some extent in its formulation of the jury instructions, when considered in the aggregate, and in light of defendant's ample opportunities to reach the jury with his theory of the case, reversal is not warranted. Accordingly, we affirm defendant's conviction.

JACKSON and WILKINS, JJ., concur.

---

**9.** There is authority from other jurisdictions which holds that a defendant may not complain of the use of excessive force when he or she occasions the use of extra force by his or her actions. *See State v. Nunes,* 546 S.W.2d 759, 764 (Mo.App.1977); *State v. Robinson,* 40 N.C.App. 514, 253 S.E.2d 311, 315 (1979).