STATE of Utah, Plaintiff and Appellee,

v.

Kim Alexander P. ROBINSON and Francis Xavier Towers, Defendants and Appellants.

No. 890053–CA.

Court of Appeals of Utah.

July 18, 1990.

Stephen R. McCaughey and Patricia Geary, Salt Lake City, for defendant and appellant Towers.

Michael Stepanian and Zadick Shapiro, argued, San Francisco, Cal., for defendant and appellant Robinson.

R. Paul Van Dam, Wendy Hufnagel and William J. Albright, Asst. Atty. Gen., argued, Salt Lake City, for plaintiff and appellee.

Before DAVIDSON, BILLINGS and JACKSON, JJ.

## OPINION

JACKSON, Judge:

Defendants Kim Alexander P. Robinson and Francis Xavier Towers appeal their third-degree felony convictions of unlawful possession of a controlled substance, in violation of Utah Code Ann. § 58–37–8 (1990),

and possession of a controlled substance without tax stamps affixed, in violation of Utah Code Ann. § 59-19-106 (Supp.1990). On appeal, they challenge the trial court's denial of their motion to suppress and they assert that the Illegal Drug Tax Stamp Act, sections 59-19-101 to -107, violates several provisions of the United States Constitution. We reverse.

## FACTS

In mid-morning on April 12, 1988, Utah Highway Patrol Trooper Anthony Garcia was travelling on the outskirts of Salt Lake City in the left-hand eastbound lane of the interstate to Cheyenne, Wyoming. He intended to stop for a stint of traffic enforcement with Trooper Lane Ogden, who was following close behind in a separate patrol car. As Garcia started to pass an eastbound grey van with California license plates, it abruptly swerved into his lane. Garcia had to slam on his brakes to avoid a collision. With lights flashing, the trooper pulled the van over to find out if there were any problems with the operation of the van and to issue a warning citation.

Garcia spoke first with the driver of the van, defendant Towers, and asked for his driver's license and the vehicle registration. Towers, who appeared very nervous and looked straight ahead, handed over his valid California license but did not immediately produce the registration. Defendant Robinson, who was riding in the passenger seat of the van, took a valid California registration from the visor and passed it to the trooper. The registration listed the van owner as Paul Jarred. Garcia asked Robinson if he was Jarred, and Robinson identified himself and handed over his own California driver's license. He said that Jarred, his boss at a floor covering business, had allowed them to take the work van on a two-week trip to the Wind Rivers area of Wyoming to visit a friend and do some fishing. He explained that they had stopped overnight in Salt Lake en route from California because of some engine troubles. When Garcia asked how the owner could be contacted to verify their permissive use of the van, Robinson pulled out and showed him a sign for his boss's company, Shamrock Floor Covering, on which there was a business telephone number. He verbally provided Garcia with another telephone number, apparently that of Robinson's own residence.

During this period of questioning, Trooper Ogden had arrived and positioned himself at the passenger window. Both officers observed that a homemade bed, two feet high, filled the back of the vehicle. They also saw two small gym bags and a fishing pole.

Garcia took Towers back to the patrol car, while Ogden stayed and talked to Robinson, who appeared nervous and told him of their vacation plans and the mechanical troubles they had had the day before. When Ogden asked why he didn't have written permission from the owner to use the van, Robinson replied that he didn't think he needed it. In the meantime, Garcia had checked with the National Crime Information Center (NCIC) for a stolen vehicle report, and had the police dispatcher call one or both of the telephone numbers Robinson had provided. The van had not been reported to NCIC as stolen, and the dispatcher could not reach anyone to verify that the owner had allowed defendants to use his van.[1] Garcia wrote out a warning citation to Towers for crossing into his lane of traffic and gave it to Towers, who returned to the van.

After directing both defendants to wait there until he returned, Garcia conversed with the other trooper at his patrol car. Meanwhile, Robinson and Towers continued standing by the side of the van. According to Ogden, the defendants were not free to go at that time. Based on what they had observed, the troopers determined to ask for consent to search the vehicle. They returned to where the men were standing by the side of the van and Garcia

---

1. It is unclear from the record whether Garcia requested dispatch to call one or both of the telephone numbers, although common sense would suggest that contact with Jarred on a weekday morning would be more likely at the business number. Garcia testified at the suppression hearing that dispatch had only been able to reach a recording by a female.

asked both men if they were carrying any weapons, large sums of money, or narcotics; both said "No." Garcia then asked them if they could make a search of the vehicle. According to the troopers, Robinson verbally agreed to this request. After Garcia told him to open the rear doors, Robinson got the keys from the cab and opened the doors, after moving the fishing pole out of the way.[2]

Through the open rear doors, both troopers saw that the bed was carpeted and that its near end was covered by a piece of plywood. Garcia touched the carpeted bed with his hands; Ogden "sniffed" near the bed. They saw five marijuana seeds in the rear corner of the van. Garcia asked Robinson what was under the bed, and Robinson told him his boss's personal belongings were in there. When Ogden then asked how to gain access to the under-bed compartment, Robinson replied that it was through the side door. When Garcia asked if they could open the side door and look under the bed, Robinson told him the side door was jammed. Garcia asked if he could try to open it anyway, which he did with no trouble after Robinson unlocked it. Garcia removed some automobile maintenance equipment next to the bed and saw fresh wood shavings and carpet fibers in the plywood on that side of the bed. He asked Robinson if he could remove some screws with the two screwdrivers he had and look underneath the bed, but Robinson said no.

Garcia then told the defendants that his normal practice was to impound the van as a possible stolen vehicle if he could not verify who the owner was. According to Garcia, he told defendants, "If there's nothing under that [bed] like you say, if we was [sic] to look under there, I would see what's under there and you could be on your way." After another discussion with Ogden, Garcia told defendants he would

attempt to get a search warrant and he returned to his patrol car. Meanwhile, Ogden asked Robinson, "Since you won't let us take the plywood panel off the van to look under the bed, would it be all right if we let a dog go through the vehicle?" According to Ogden, Robinson replied, "Yes," then asked something to the effect of "Does this mean I am giving consent to the search?" Ogden said, "Yes," and Robinson shook his head affirmatively.[3]

The dog arrived with its handler fifteen to twenty minutes later. Defendants were arrested after the dog gave a positive alert at the rear of the bed and the troopers located eight duffel bags of marijuana in the space under the bed's platform.

Defendants filed a motion to suppress the marijuana found under the bed, contending that the search of the van was the product of an illegal detention and that no actual consent to search was given. In opposition, the State argued that (1) the detention after the valid stop was not illegal because it was based on a reasonable, articulable suspicion of criminal activity, and (2) Robinson gave valid consent to the search of the van. In denying the defendants' motion, the trial court found that: Garcia had probable cause to initially stop the vehicle; during the stop and the "routine procedure of attempted identifying and verification," the troopers developed "further articulable facts which gave rise to a reasonable suspicion sufficient to seek and obtain consent for the search of the van"; and "Robinson consented to the search of the van." The trial court also found that thirty-eight minutes elapsed from the time of the traffic stop until the arrest.

Defendants were tried without a jury on the testimony elicited at the motion to suppress, and this appeal ensued.

---

**2.** Both defendants denied that Robinson consented to the search of the van by the troopers or by the dog. Robinson insisted that Garcia had not requested any consent, but had merely ordered him to open the rear and side doors. He also said he refused permission to have the dog conduct a narcotics search. The trial court

nonetheless accepted the troopers' versions of both of Robinson's consents, finding them "more credible." Defendants do not challenge the trial court's factual finding that Robinson actually consented.

**3.** See note 2, *supra*.

## I.

■ Defendants first contend that the stop of the van for a lane violation and their initial detention for that purpose violated their fourth amendment rights because the stop was a pretext to search for evidence of a more serious crime. *See State v. Marshall,* 791 P.2d 880, 882–83 (Utah Ct.App.), *petition for cert. filed,* 135 Utah Adv.Rep. 78 (1990). However, it is clear from the record that this issue was not raised, argued, or ruled upon in the trial court as a ground for defendants' motion to suppress. Absent a showing of special circumstances or plain error, we decline to consider the constitutionality of the traffic stop because defendants have raised it for the first time on appeal. *State v. Carter,* 707 P.2d 656, 660 (Utah 1985); *State v. Webb,* 790 P.2d 65, 77–78 (Utah Ct.App.1990).

## II.

We turn next to defendants' claim that, even if the stop was lawful at its inception, their continuing detention for questioning after Towers was given a warning citation constituted a seizure that violated their fourth amendment rights. They contend that the purpose for the traffic stop was then complete and that, at that point, the troopers lacked any reasonable suspicion of criminal activity sufficient to detain them further.

"[I]n determining whether the seizure and search were 'unreasonable' our inquiry is a dual one—whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified it in the first place." *Terry v. Ohio,* 392 U.S. 1, 19–20, 88 S.Ct. 1868, 1878–79, 20 L.Ed.2d 889 (1968).

■ An officer conducting a routine traffic stop may request a driver's license and vehicle registration, conduct a computer check, and issue a citation. *United States v. Guzman,* 864 F.2d 1512, 1519 (10th Cir.1988). However, once the driver has produced a valid license and evidence of entitlement to use the vehicle, "he must be allowed to proceed on his way, without being subject to further delay by police for additional questioning." *Id.* Any further temporary detention for investigative questioning after the fulfillment of the purpose for the initial traffic stop is justified under the fourth amendment only if the detaining officer has a reasonable suspicion of serious criminal activity. *Id.; United States v. Walker,* No. 90–CR–13, slip op. at 5 (D.Utah March 27, 1990). The detaining officers must be able to articulate a particularized and objective basis for their suspicions that is drawn from the totality of circumstances facing them at the time of the seizure. *United States v. Cortez,* 449 U.S. 411, 417–18, 101 S.Ct. 690, 694–95, 66 L.Ed.2d 621 (1981); *see State v. Mendoza,* 748 P.2d 181, 183 (Utah 1987).

■ Whether the requisite reasonable suspicion was present to support an investigatory detention by a police officer presents a question of fact. *Mendoza,* 748 P.2d at 183. We review factual determinations underlying the grant or denial of a motion to suppress under the "clearly erroneous" standard. *State v. Ashe,* 745 P.2d 1255, 1258 (Utah 1987); *Marshall,* 791 P.2d at 882; *Webb,* 790 P.2d at 82. A trial court's finding is clearly erroneous if it is without adequate evidentiary support in the record or if it is induced by an erroneous view of the law. *State v. Walker,* 743 P.2d 191, 193 (Utah 1987); *see State v. Arroyo,* 796 P.2d 684, 686 (Utah 1990) (a finding not supported by substantial competent evidence is clearly erroneous).

The trial court relied on the following in determining there was a reasonable suspicion of criminal activity: nervousness, during the initial traffic stop, of Towers, who failed to make eye contact with Garcia, and of Robinson, who was talkative and appeared to Ogden to be evasive about questions concerning the van; the fact that the troopers observed no cold weather gear or clothing for the defendants' two-week trip to Wyoming other than two small duffel bags and a fishing pole; and the defendants' failure to produce either written permission from the vehicle owner or a suc-

cessful means of contacting the owner during the traffic stop in order to verify their permissive use of the van.

In part because avoidance of eye contact is consistent with innocent as well as criminal behavior, Utah appellate courts have previously held that such nervous conduct can be afforded no weight in determining a detaining officer's reasonable suspicion of criminal activity. *Mendoza*, 748 P.2d at 184; *State v. Sierra*, 754 P.2d 972, 976 (Utah Ct.App.1988), *overruled on other grounds, State v. Arroyo*, 796 P.2d 684 (1990). When questioned about Robinson's nervous demeanor, Ogden stated he thought it was suspicious that Robinson "wanted to talk about everything but what was in the van or something to do with the van. If I ever asked him a question about the van, he would start telling me [about other things], but if ever the conversation reverted back to the van or any questions about the van, then he would change the subject and that is an evasive answer, to me." Ogden did not specify what questions he asked Robinson about the van. In the absence of other, objective facts, we decline to give much weight to an officer's assessment of "nervousness" due to the subjectivity of that determination. *See, e.g., State v. Sery*, 758 P.2d 935, 944–45 (Utah Ct.App.1988).

The weight to be given the absence of any visible cold weather gear or clothing is also slight, since it does not objectively suggest that criminal activity is afoot. Although it may reflect hasty or inadequate travel preparations, it is also consistent with the fact that most residents of the Bay Area in California have little need to own cold weather clothing and gear and must rely on their cold weather hosts to provide it for them when they visit.

At the time Garcia detained defendants by ordering them to stand by the van until he returned from conversing with Ogden, the warning citation had already been given. The troopers had already obtained valid drivers' licenses and a valid vehicle registration, as had the detaining officer in *Guzman*, 864 F.2d at 1519. The troopers knew that the vehicle had not been reported as stolen. They had checked the tendered sources for verifying defendants' claim that the van owner had indeed given them permission to use the van. This checking disclosed no further information or facts upon which the officers could base any suspicion that the van had been stolen and no reason to believe that these potential verification sources could be pursued again, with success, within a reasonable time.

Even considering all the circumstances facing the troopers, the fact that defendants could not—during the brief time span of the valid traffic stop—produce either written authorization from the owner or a successful telephone contact with the owner is insufficient to provide the officers with reasonable suspicion of car theft or other serious crime[4] sufficient to justify the roadside detention and questioning that followed.[5] *See United States v. Walker*, No. 90–CR–13, slip op. at 10–11 (D.Utah March 27, 1990).

In sum, we conclude that the trial court clearly erred in its finding that the troopers

---

**4.** The trial court did not specify *which* serious criminal activity it found the troopers reasonably suspected. In light of Garcia's claim that his purpose in detaining defendants was to investigate their use of the van and conduct a search to make sure that the owner was not hidden beneath the bed, the trial court must have believed that the suspected criminal activity was theft of the van. Notwithstanding Garcia's protestations to the contrary, it is apparent from the record that the troopers were actually detaining defendants in order to pursue their suspicions about drug trafficking. That the trooper's "'hunch' about [defendants] proved correct is perhaps a tribute to his policeman's intuition, but it is not sufficient to justify, *ex*

*post facto*, a seizure that was not objectively reasonable." *Guzman*, 864 F.2d at 1520 (quoting *United States v. Smith*, 799 F.2d 704, 708 (11th Cir.1986)).

**5.** People frequently borrow others' cars, for a single trip to the grocery store or for months while owners are away or indisposed. We do not believe that the borrowers' personal privacy rights should be open to violation by police officers after a routine traffic stop merely because the vehicle owners do not provide convincing written permission or because the owners do not remain constantly accessible via telephone.

had the reasonable suspicion of criminal activity necessary to justify their continued detention and questioning of Robinson and Towers once the warning citation was given and the purposes for the initial stop had been accomplished. Defendants' detention after that point was, therefore, a violation of their fourth amendment rights.

### III.

■■■■ The State contends that the marijuana uncovered by the troopers is nonetheless admissible against defendants because Robinson validly consented to the warrantless search of the van during the unconstitutional detention.[6] Two factors determine whether consent to a search is lawfully obtained following police action that violates the fourth amendment, such as the unlawful detention here: (1) the consent must be voluntary in fact; and (2) the consent must not be obtained by police exploitation of the prior illegality. *Arroyo*, 796 P.2d 684. Both tests must be met in order for evidence obtained in searches following police illegality to be admissible. *Id.*

Whether a consent to a search was in fact voluntary

> or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances. While knowledge of the right to refuse consent is one factor to be taken into account, the government need not establish such knowledge as the *sine qua non* of an effective consent.

*Schneckloth v. Bustamonte*, 412 U.S. 218, 227, 93 S.Ct. 2041, 2048, 36 L.Ed.2d 854 (1973). In examining all the surrounding circumstances to determine if in fact the consent to search was coerced, a court must take into account both the details of

police conduct and the characteristics of the accused, *Arroyo*, 796 P.2d at 684 which include "subtly coercive police questions, as well as the possibly vulnerable subjective state of the person who consents." *Schneckloth*, 412 U.S. at 229, 93 S.Ct. at 2049. It is the State's burden to prove that a consent to search was voluntary.[7] *United States v. Mendenhall*, 446 U.S. 544, 557, 100 S.Ct. 1870, 1878, 64 L.Ed.2d 497 (1980); *Schneckloth*, 412 U.S. at 222, 93 S.Ct. at 2045; *Arroyo*, 796 P.2d at 684.

■■■ The trial court did not expressly resolve the voluntariness question, finding only that Robinson had consented to the search of the van. Although we would ordinarily remand for the requisite finding on voluntariness and any necessary subsidiary factual findings by the trial court as factfinder, we conclude that the record at the suppression hearing is sufficiently detailed and complete to allow us to determine on the undisputed facts whether the State has met its burden of proof on the voluntariness issue. *See Brown v. Illinois*, 422 U.S. 590, 604, 95 S.Ct. 2254, 2262, 45 L.Ed.2d 416 (1975); *United States v. Recalde*, 761 F.2d 1448, 1453 n. 4 (10th Cir. 1985); *cf. State v. Strain*, 779 P.2d 221, 227 (Utah 1989) (remand necessary where record is inadequate).

■■■ Here, the defendants were first questioned about their right to possession of the van during the brief, initially valid traffic stop. Once the legal basis for that stop had ended, after a short period of detention, they were nonetheless not free to leave. They were detained and questioned about matters other than the traffic violation on the side of the interstate by two armed police officers with apparent, though false, authority to do so, then ordered by one trooper to remain at the van

---

6. The defendants' testimony that they were given permission by the owner to take the van on a two-week vacation trip was not disputed by the State. We hold that they established a possessory interest in the van sufficient to give them both a legitimate expectation of privacy in the entire van interior. *See Rakas v. Illinois*, 439 U.S. 128, 148, 99 S.Ct. 421, 433, 58 L.Ed.2d 387 (1978); *United States v. Walker*, No. 90–CR–13, slip op. at 6 (D.Utah March 27, 1990).

7. As the Utah Supreme Court recently stressed, a prosecutor attempting to prove voluntary consent after illegal police action "'has a much heavier burden to satisfy than when proving consent to search' which does not follow police misconduct." *Arroyo*, 796 P.2d at 687–88 (quoting *United States v. Melendez–Gonzalez*, 727 F.2d 407, 414 (5th Cir.1984)).

and await his return. They complied with his commands. Next, they were questioned about whether they were carrying any contraband and asked to consent to a search of the vehicle. There is no evidence that Robinson was aware or was informed that he did not have to accede to the trooper's request. *See United States v. Jones*, 846 F.2d 358, 361 (6th Cir.1988). At that time, it was apparent that the defendants would be kept in that custodial environment until the troopers satisfied their curiosity about the contents of the van, particularly the area under the bed. In light of the troopers' questioning and conduct, the coercive atmosphere at the time, and the other surrounding circumstances, we conclude that the State has not borne its burden of proving that Robinson's consent to search the vehicle was voluntary.

■ We reach the same conclusion about Robinson's subsequent consent to allow the narcotics dog to search the van interior. The coerciveness of the continuing custodial situation had increased by that point in time, which was about twenty minutes after the traffic stop. Robinson had complied with the troopers' directions to open the rear door and unlock the side door. After Robinson attempted to thwart their access to the under-bed compartment by saying that the side door was inoperable, even the troopers testified that he had refused outright to consent to their search of the under-bed compartment. This refusal of consent prompted Garcia to threaten to impound the van and seek a search warrant, implying that defendants would be detained in the meantime. After Garcia returned to his patrol car, apparently for the latter purpose, the other trooper asked for and obtained Robinson's consent to allow the sniff search by the dog. Under these circumstances, the State has failed to establish that the consent was free from coercion.

Because the consents to search were not voluntarily given, they fail the first of two tests for the validity of consents obtained following initial police action that violates

the fourth amendment. *See Arroyo*, 137 Utah Adv.Rep. at 15.

In light of the State's failure to establish the consent exception to the fourth amendment's requirement that a search be conducted pursuant to a warrant, we conclude that the trial court erroneously denied defendants' motion to suppress the marijuana found in the van. Since the inadmissible marijuana was the only evidence supporting defendants' convictions of possession of a controlled substance with intent to distribute and possession of a controlled substance without tax stamps affixed, we reverse both convictions of each defendant and remand for dismissal of the charges.

In light of our disposition of the suppression issue, we find it unnecessary to reach defendants' federal constitutional challenges to the Illegal Drug Tax Stamp Act, Utah Code Ann. §§ 59-19-101 to -107 (Supp.1990), including whether it violates the commerce clause by unduly burdening interstate commerce.[8] *See Complete Auto Transit Inc. v. Brady*, 430 U.S. 274, 97 S.Ct. 1076, 51 L.Ed.2d 326 (1977).

DAVIDSON and BILLINGS, JJ., concur.

■

---

**8.** We note that defendants' other constitutional challenges to the statute were recently rejected

by this court in *State v. Davis*, 787 P.2d 517 (Utah Ct.App.1990).