**STATE of Utah, Plaintiff and Appellee,**

**v.**

**Michael PATEFIELD, Defendant and Appellant.**

No. 950736–CA.

Court of Appeals of Utah.

Nov. 7, 1996.

Rosalie Reilly, Monticello, for Defendant and Appellant.

Jan Graham, Todd A. Utzinger, and Craig Halls, Salt Lake City, for Plaintiff and Appellee.

Before ORME, DAVIS, and GREENWOOD, JJ.

## OPINION

DAVIS, Associate Presiding Judge:

Michael Patefield appeals his convictions of possession of a controlled substance, a third degree felony, in violation of Utah Code Ann. § 58–37–8(2)(a)(i) (Supp.1995); possession of a controlled substance, a class B misdemeanor, in violation of Utah Code Ann. § 58–37–8(2)(a)(i) (Supp.1995); and possession of drug paraphernalia, a class B misdemeanor, in violation of Utah Code Ann. § 58–37a–5(1) (1994). We reverse.

## BACKGROUND

■ The following facts are taken from the transcript of the September 5, 1995, hearing on Patefield's Motion to Suppress. In reviewing a trial court's ruling on a suppression motion, we consider the facts "in a light most favorable to the trial court's findings." *State v. Delaney*, 869 P.2d 4, 5 (Utah App.1994).

On the night of April 28, 1995, Utah Highway Patrol Officer Rick Eldredge stopped an older model Volkswagen bus on SR–191, north of Monticello, Utah, for "an equipment problem." Namely, the vehicle's rear license plate light was burned out, a violation of Utah state motor vehicle regulations. *See* Utah Code Ann. § 41–6–120(b) (1993). Eldredge had followed the vehicle for about one mile before making the stop. Eldredge approached the vehicle and identified the driver by his driver's license as Patefield. Eldredge advised Patefield that he was stopped because his license plate light was out. Hence, Eldredge merely issued a verbal warning to Patefield. However, at that point, having acknowledged that "he had just recently fixed [the light], and it was out again," Patefield "asked if he could fix it." No testimony was given to clarify whether Eldredge returned Patefield's driver's license or told Patefield that he was free to leave before Patefield offered to repair the light.

Patefield's passenger, William Wiley, handed him a replacement light bulb from the glove box and Patefield, followed by Eldredge, went to the rear of his van to fix the light. While Patefield struggled with the burned out bulb, Eldredge held his flashlight to light the area for Patefield. Unable to remove the old bulb, Patefield went to the passenger side of the van and opened the sliding door to get his tool box. Having followed Patefield to the side of the vehicle, Eldredge saw that the van was packed with food, clothing, backpacks, coolers, and several twelve-packs of beer. One of the twelve packs had been opened and half of its contents was gone. Patefield gathered the tools required to fix the light and the two men went back to the rear license plate.

While Patefield continued working on the light, Eldredge "could smell the odor of alcohol coming from [Patefield's] breath" as Patefield described the Lake Powell camping trip on which he and Wiley were embarking. Patefield demonstrated no physical signs of intoxication and Eldredge determined that Patefield was not under the influence of alcohol. Yet, based on his observing the half empty twelve-pack of beer in the van, coupled with the scent of beer emanating from Patefield's breath, Eldredge asked Patefield if he had been drinking. Patefield acknowledged that he had earlier consumed a beer with his dinner. After explaining his concern over the half empty twelve-pack and the smell of beer on Patefield's breath, Eldredge decided to search the vehicle for open beer containers. In a colloquy with the trial court, counsel for the State acknowledged that the search was without Patefield's consent and that probable cause and exigent

circumstances were necessary to justify the search.

The two men then went back to the open sliding door on the passenger side of the van where Patefield asked Wiley to exit the vehicle. Wiley complied, taking with him the dog that was also in the van. Eldredge, then standing in front of the open sliding door,

> leaned across to the other side of the vehicle, across the coolers and the clothes, [and] the food that they had there, to look directly behind the driver's seat.... [Eldredge then lifted up the clothes and blankets] to make sure that there w[ere] no open containers of alcohol that had been placed back there. At that time, [Eldredge] could smell the odor of burnt marijuana coming from within one or two fanny packs that w[ere] laying [sic] right there to the center of the van.

The fanny packs did, indeed, contain marijuana, and the State charged Patefield with the aforementioned possession offenses.[1] Patefield filed a Motion to Suppress all evidence obtained during, and as a result of, the search of his van. At the suppression hearing, Eldredge testified on behalf of the State; Patefield presented no evidence. The trial court found that the initial stop was justified, that Patefield had voluntarily extended the duration of the stop, and that Eldredge had probable cause to search Patefield's van. In light of the court's findings, Patefield entered conditional pleas of guilty to all the charges against him, reserving the right to appeal the trial court's decision. This appeal followed.

## ISSUES AND STANDARDS OF REVIEW

Patefield raises three issues: (1) Whether Eldredge exceeded the scope of the initial traffic stop once he gave Patefield a verbal warning and then remained at the site of the stop to assist Patefield after Patefield asked to repair his burned-out license plate bulb; (2) whether Eldredge's warrantless search of Patefield's van was supported by probable cause; and (3) whether exigent circumstances necessitated Eldredge's warrantless search of Patefield's van.

We review the factual findings underlying a trial court's ruling on a motion to suppress under a clearly erroneous standard. *State v. Troyer*, 910 P.2d 1182, 1186 (Utah 1995); *State v. Castner*, 825 P.2d 699, 702 (Utah App.1992). Clear error will be found only when the trial court's factual findings run against the clear weight of the evidence. *Castner*, 825 P.2d at 702; *see also State v. Pena*, 869 P.2d 932, 935–36 (Utah 1994) (discussing appellate standards of review). Though we consider the facts in a light most favorable to the trial court's determination, we review the trial court's legal conclusions based on those facts "for correctness according no deference to the trial court's conclusions." *State v. Yates*, 918 P.2d 136, 138 (Utah App.1996).

"We review a trial court's determination of whether a particular set of facts constitutes probable cause nondeferentially for correctness, affording a measure of discretion to the trial court." *State v. Spurgeon*, 904 P.2d 220, 225 (Utah App.1995). Lastly, whether exigent circumstances existed is a question of fact which we will not disturb on appeal unless clearly erroneous. *State v. Morck*, 821 P.2d 1190, 1194 (Utah App.1991).

## ANALYSIS

### A. Scope of the Traffic Stop

In reviewing the legality of a traffic stop, we consider two questions: "[W]hether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Terry v. Ohio*, 392 U.S. 1, 20, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968); *accord State v. Lopez*, 873 P.2d 1127, 1131–32 (Utah 1994).

Clearly, Eldredge's stop of Patefield was justified at its inception: Eldredge stopped Patefield for having a burned-out license plate bulb, a violation of Utah Code Ann. § 41–6–120(b) (1993). Patefield concedes that Eldredge's decision to stop him and issue a verbal warning was well within his

---

1. At the suppression hearing, additional testimony was given linking Wiley to the ownership of the second fanny-pack once the trio reached the county jail. Wiley's case is on separate appeal in this court and thus we do not recite facts not pertinent to Patefield's case.

legal authority. Nonetheless, Patefield argues that an "unlawful detention in this case began, most conservatively, at the point when the trooper gave the verbal warning *and did not allow the occupants to proceed on their way.*" (Emphasis added.) Patefield contends the entire encounter between him and Eldredge was a level two police-citizen encounter during which Eldredge exceeded the scope of the traffic stop.

In *Salt Lake City v. Smoot,* 921 P.2d 1003 (Utah App.), *cert. denied,* 925 P.2d 963 (Utah 1996), this court categorized the three levels of police-citizen encounters as follows:

> Under *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and its progeny, there are three levels of police-citizen encounters, each requiring a different degree of justification under the Fourth Amendment. *State v. Munsen,* 821 P.2d 13, 15 n. 1 (Utah App.1991), *cert. denied,* 843 P.2d 516 (Utah 1992). The first level occurs when an officer approaches and questions a suspect. An officer may stop and question a person at any time so long as that person "is not detained against his [or her] will." *Id.* The next level is reached when an officer temporarily seizes a person. In order to legally effect a temporary seizure, the officer must have "articulable suspicion" that the suspect has or is about to commit a crime, and the detention must be limited in scope. *Id.* The third level is arrest, which requires probable cause for the officer to believe that a crime has been or is about to be committed. *Id.*

*Smoot,* 921 P.2d at 1006 (alteration in original). At the suppression hearing, the following colloquy took place between the trial court and Patefield's attorney:

> Counsel: The officer had a right to give [Patefield] a verbal warning; he had the right to give him a citation. And, he gave him a verbal warning to fix it. Mr. Patefield responded to that.
>
> Court: But, you're telling me at the same time that the officer said, "Just get it fixed" whenever you want to, and in the same breath, you're telling me that Mr. Patefield felt compelled to fix it right then. So, which is it? Did the officer say, "You

have to fix it right now" and is that the message that came across to Mr. Patefield? Or, did he say, "Fix it whenever you want to" and that's the message that came across?

> Counsel: Okay. The officer's testimony said that it was "just to get it fixed." He just wanted it fixed. He was going to give a verbal warning. I don't think the officer entertained a[n] idea in his mind about giving a citation. When he told Mr. Patefield that he wanted it fixed, Mr. Patefield responded immediately to him. I don't know necessarily that it would be fair to say that he was ordered, but I think he was responding to the police officer's presence. Certainly he would be responding when he gets out of the car and walks and the officer follows him and stays with him the whole time.
>
> Court: Okay. So, you're saying that Mr. Patefield felt that he had been commanded to fix it right [then]?
>
> Counsel: No. . . . My concern is that I don't think that Mr. Patefield was in a position where he realized that all of a sudden it went from a traffic stop to a consensual encounter.

Rather than adopting the position argued by Patefield's counsel, and instead basing its decision on Eldredge's testimony, the trial court found that "Patefield voluntarily went back to fix [the light]," thus concluding the level two seizure for purposes of the initial stop and converting the encounter into a level one police-citizen encounter. We agree with the trial court that Patefield voluntarily extended the duration of the stop, thereby converting the level two police-citizen encounter into a level one encounter.

This court has recognized that " '[a]n officer conducting a routine traffic stop may request a driver's license and vehicle registration, conduct a computer check, and issue a citation.' " *State v. Sepulveda,* 842 P.2d 913, 917 (Utah App.1992) (alteration in original) (quoting *State v. Robinson,* 797 P.2d 431, 435 (Utah App.1990)). Moreover, "[t]he officer may also check for outstanding warrants 'so long as it does not significantly extend the period of detention.' " *Id.* (quoting *State v. Figueroa–Solorio,* 830 P.2d 276, 280 (Utah

App.1992)). "However, once the occupants of the vehicle have satisfied the reasons for the initial stop, the officer must permit them to proceed." *Id.* " 'Any further temporary detention for investigative questioning after the fulfillment of the purpose for the initial traffic stop is justified under the fourth amendment only if the detaining officer has a reasonable suspicion of serious criminal activity.' " *Id.* (quoting *Robinson,* 797 P.2d at 435).

Additionally, the Utah Supreme Court has held, "[n]ot every encounter between a police officer and a citizen is a seizure." *State v. Higgins,* 884 P.2d 1242, 1244 (Utah 1994). "A person is seized under the Fourth Amendment when, considering the totality of the circumstances, the police conduct would have communicated to a reasonable person that the person was not free to decline the officer's requests or otherwise terminate the encounter and go about his or her business." *Id.; accord United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980). Illustrating this standard, the United States Supreme Court noted:

> Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.

*Mendenhall,* 446 U.S. at 554, 100 S.Ct. at 1877. Finally, the Utah Supreme Court has declared:

> Once a person is seized for Fourth Amendment purposes, the seizure does not cease simply because the police formulate an uncommunicated intention that the seized person may go on his or her way. For the seizure to end, it must be clear to the seized person, either from the words of an officer or from the clear import of the circumstances, that the person is at liberty to go about his or her business.

*Higgins,* 884 P.2d at 1244. Thus, regardless of the circumstances, "[t]he test for when [a] seizure occur[s] is objective and depends on when the person reasonably feels detained, not on when the police officer thinks the person is no longer free to leave." *State v. Ramirez,* 817 P.2d 774, 786 (Utah 1991).

In *Mendenhall,* the United States Supreme Court considered whether a seizure occurred under the following circumstances: Mendenhall was observed by two federal DEA agents disembarking from her plane. Having concluded that Mendenhall's conduct "appeared ... to be characteristic of persons unlawfully carrying narcotics, the agents approached her as she was walking through the concourse, identified themselves as federal agents, and asked to see her identification and airline ticket." 446 U.S. at 547–48, 100 S.Ct. at 1873 (footnote omitted). Under these facts, the Supreme Court concluded, "[Mendenhall] was not seized simply by reason of the fact that the agents approached her, asked her if she would show them her ticket and identification, and posed to her a few questions. Nor was it enough to establish a seizure that the person asking the questions was a law enforcement official." *Id.* at 555, 100 S.Ct. at 1877.

In the case sub judice, as previously noted, there is no question that Patefield was seized by Eldredge's traffic stop. Rather, our concern is whether, when viewed under an objective standard, someone in Patefield's position would reasonably have felt free to leave after Eldredge gave the equipment failure warning. There are no facts here to suggest that Eldredge compelled Patefield to repair the faulty light, and indeed, at the suppression hearing, Patefield conceded that Eldredge meant only to issue a verbal warning for the equipment failure. Thus, there was no " 'further temporary detention for investigative questioning,' " *Sepulveda,* 842 P.2d at 917 (quoting *Robinson,* 797 P.2d at 435), but rather Patefield acted of his own accord in offering to repair the broken light. Accordingly, though the record is less than precise as to exactly what was said during the exchange between Eldredge and Patefield, assessing the facts under a clearly erroneous standard, we cannot say that the trial court's finding that Patefield voluntarily undertook to fix his license plate light, just as the encounter with Eldredge was otherwise con-

cluding, runs against the clear weight of the evidence.

Also, as in *Mendenhall,* Eldredge's presence· alone was not enough to prolong the level two seizure beyond the time when he issued Patefield a verbal warning. The record is void of any evidence suggesting that Eldredge "use[d] ... language or [a] tone of voice" demonstrating that Patefield was compelled to fix the light on the spot. *Mendenhall,* 446 U.S. at 554, 100 S.Ct. at 1877. Rather, Eldredge merely assented to Patefield's request to exit his van to repair the faulty light, and then held his flashlight as Patefield worked on the light, apparently only as an accommodation to a motorist rather than to prolong the encounter to pursue some investigative purpose. In so doing, Eldredge did nothing more than assist Patefield as we hope any other peace· officer would assist a similarly situated motorist. Thus, we conclude that the trial court's factual findings are not against the clear weight of the evidence and that the court was correct in denying Patefield's Motion to Suppress because Eldredge did not unlawfully extend the scope of the initial level two traffic stop, but rather Patefield acted of his own free will in converting the stop into a level one police-citizen encounter.

### B. Probable Cause

■ Patefield next argues that Eldredge lacked probable cause to search his vehicle, and thus the trial court erred in not suppressing the evidence discovered during, and as a result of, the search. " 'Probable cause exists where "the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a [person] of reasonable caution in the belief that" an offense has been or is being committed.' "[2] *Spurgeon,* 904 P.2d at 226 (alterations in original) (quoting *State v. Dorsey,* 731 P.2d 1085, 1088 (Utah 1986) (quoting *Brinegar v. United States,* 338 U.S. 160, 175–76, 69 S.Ct. 1302, 1310–11, 93 L.Ed. 1879 (1949))). "Probable cause is an· objective

standard." *Id.* Thus, "[d]eterminations of whether probable cause exists require a common sense assessment of the totality of the circumstances confronting the arresting or searching officer." *Id.* Probable cause merely requires " 'a rationally based conclusion of probability,' " *id.* at 226–27 (quoting *Dorsey,* 731 P.2d at 1088), " ' "and not a prima facie showing ... of criminal activity." ' " *Id.* at 227 (quoting *State v. Brown,* 798 P.2d 284, 285 (Utah App.1990)) (citations omitted in original).

The facts of the case before us do not support the trial court's conclusion that Eldredge had probable cause to search Patefield's van. Before stopping Patefield for the equipment violation, Eldredge followed Patefield for about one mile, and at no time suspected that Patefield was driving under the influence. Moreover, when Eldredge stopped Patefield, spoke with him, and when the two men initially went to the back of the van, Eldredge did not suspect Patefield was inebriated. While accompanying Patefield to the side of the van as Patefield retrieved his tools, Eldredge did observe, in plain sight, several twelve-packs of beer, one of which was open with approximately half of its containers missing, along with numerous camping items and food stores.

Once Patefield and Eldredge had returned to the rear of the van and Patefield resumed his attempt to fix the lighting problem, Patefield explained that he and Wiley were beginning a camping trip, thus explaining the equipment, food stores, and beer. It was at this point that Eldredge began to smell alcohol on Patefield's breath, even though, as previously noted, Eldredge did not smell alcohol on Patefield's breath when he initially stopped Patefield and gave him the equipment failure warning. Finally, when questioned whether he had been drinking and whether there were open containers in his van, Patefield conceded that he had consumed a beer earlier in the evening at dinner, yet he asserted that there were no open containers in the vehicle. Significantly, there is nothing in the record suggesting an odor

---

**2.** Here, Eldredge suspected Patefield had violated Utah's "open container" law, Utah Code Ann. § 41–6–44.20 (1993), making it an offense to

have in a vehicle an open vessel containing an "alcoholic beverage" as defined under Utah Code Ann. § 32A–1–105 (1993).

of beer emanating from the van at any time, and open beer cans are not typically re-closed.

Possession of a twelve-pack of beer in an automobile is a legal activity, apropos of nothing. Possession of a partially full twelve-pack of beer in an automobile is a legal activity which, by itself, does not suggest the presence of open containers in the vehicle, even though it may suggest that on some prior occasion beers were consumed or moved to an ice chest. The discernible odor of beer on the driver's breath adds nothing because the beer Patefield admitted he consumed could just as easily have been drunk outside the vehicle, with the can discarded in a trash barrel. Considering the totality of the circumstances, we conclude that Eldredge's determination that Patefield's van may have contained open containers has no rational basis. Therefore, the trial court incorrectly determined that Eldredge's search of Patefield's vehicle was supported by probable cause.

Because we hold that Eldredge's search of Patefield's van was not supported by probable cause, we need not address Patefield's exigent circumstances challenge.

## CONCLUSION

We conclude that Eldredge's initial level two encounter with Patefield became a voluntary encounter when Patefield offered to repair his broken license plate bulb. However, under the totality of the circumstances, Eldredge's subsequent search of Patefield's van was not supported by probable cause. Accordingly, the trial court incorrectly denied Patefield's Motion to Suppress. Therefore, the trial court's order is reversed and the case remanded for a trial or such other proceedings as may now be in order.

ORME, P.J., and GREENWOOD, J., concur.