2000 Utah Ct. App. 55

**SALT LAKE CITY, Plaintiff and Appellee,**

v.

**Carolyn L. RAY, Defendant and Appellant.**

No. 990049–CA.

Court of Appeals of Utah.

March 2, 2000.

Jeffrey W. Hall, Salt Lake Legal Defender Association, and Jay T. Jorgensen, Stoel Rives, LLP, Salt Lake City, for Appellant.

Don M. Wrye, Salt Lake City Prosecutor's Office, Salt Lake City, for Appellee.

Before GREENWOOD, P.J., DAVIS, and ORME, JJ.

## OPINION

DAVIS, Judge:

¶ 1 Defendant Carolyn L. Ray appeals the trial court's order denying her motion to suppress, arguing that the court erred in denying her motion because the police officers conducted a level two stop without the requisite reasonable suspicion. We reverse.

## BACKGROUND

¶ 2 At approximately 6:30 or 7:00 on the morning of May 27, 1998, Ray visited a Salt Lake City convenience store that operated twenty-four hours a day. After making a purchase, Ray left the store to wait for a ride, which still had not arrived some two hours later. Although Ray was not causing any problems in front of the store and Rory Boehner, the manager, never asked her to leave, because of the duration of Ray's wait, Boehner eventually telephoned the police. During his call, Boehner did not advise of any suspicions he may have had that Ray had engaged in any illegal activity, instead informing the police only that she had been in front of the store for two hours.

¶ 3 In response, Officers Robert Eldard and Kevin Jones received a dispatch to investigate a "suspicious female" at the store. Eldard, who was driving a marked police car, arrived first at the store and found a woman, Ray, standing outside near a pay phone. Eldard correctly surmised this was the woman mentioned in the dispatch but, to quickly verify, Eldard "opened the door and poked [his] head in and asked the clerk who the problem person was." The clerk "pointed to Ms. Ray."

¶ 4 Officer Eldard, clad in his police uniform, with his "[b]adge, gun, [and] the whole works," approached Ray and began to question her regarding her presence at the store. Ray told Eldard that she had made an earlier purchase—which, according to Eldard, was confirmed by the container next to Ray—and that she was waiting for a ride to work. When asked how long she had been waiting, Ray responded that she had been there approximately thirty minutes. However, when Eldard poked his head back in the door, the manager stated that she had been there about two hours. As Eldard resumed questioning Ray, Officer Jones, who was similarly clad in his police uniform, arrived in his police cruiser, entered the store, and was advised by Boehner that he called the police because Ray had been standing outside for a couple of hours and that Boehner wanted the police to check it out. Jones joined Eldard and also asked Ray what she was doing and

why she was there, to which Ray then replied that she had been waiting for two hours for a ride to work.

¶ 5 According to Officer Eldard, during the questioning Ray appeared nervous, although not agitated, and she talked fast and repeatedly shifted her weight from one foot to the other. Although neither Eldard nor Jones thought that Ray had committed any crime at that point, apparently Eldard's curiosity was sufficiently piqued that he asked defendant for her identification, whereupon she readily produced her state identification card. Rather than viewing the information and returning the card, Officer Eldard retained Ray's identification and stepped off to the side and away from Ray to check for warrants on his portable radio. The warrant check took approximately five minutes and revealed no outstanding warrants. At the hearing on Ray's motion to suppress, Officer Eldard testified that while he retained the identification and performed the warrant check, if Ray had taken the identification back and left, he would have let her go. Nonetheless, Eldard recognized "the fact that I had her I.D. might have caused her to wait," and never communicated to Ray that she was free to leave.

¶ 6 While Eldard conducted the warrant check, Officer Jones continued questioning Ray and asked Ray about the contents of her bag, namely whether she had "any drugs, knives, or any weapons or anything like that that [Jones] should know about." When Ray responded in the negative, Jones asked to search her bags anyway and Ray consented. Upon examining the contents of Ray's bags, Jones found a case for a compact disc player, which Ray later claimed belonged to her friends. Upon opening the case, however, Jones discovered not stereo equipment, but paraphernalia which, to his understanding based on his training and experience, were commonly used for taking illegal drugs. Officer Jones initially placed Ray in custody but then released her at the store with a citation.

· ¶ 7 The City charged Ray with use or possession of drug paraphernalia, a Class B misdemeanor, in violation of the Salt Lake City Code, section 11.20.040. Ray moved to suppress the evidence obtained during the search, arguing that it was obtained pursuant to an impermissible stop and detention not supported by a reasonable articulable suspicion that she had committed or was about to commit a crime. After a hearing on the motion, however, the trial court determined that "[t]he encounter between Officers Eldard and Jones could arguably be a level one stop" and that, under the totality of the circumstances, Ray's Fourth Amendment rights were not violated. Accordingly, the court denied Ray's motion to suppress. Ray entered a subsequent plea of no contest, reserving her right to appeal the trial court's denial of her motion to suppress and filed a timely notice of appeal. The court imposed a fine and suspended sentence and placed Ray on probation for two years.

## ISSUE AND STANDARD OF REVIEW

 ¶ 8 On appeal, Ray argues the trial court erred in denying the motion to suppress and in concluding that she was not seized in violation of the Fourth Amendment at the time she consented to Jones searching her bags. On appeal from the denial of a motion to suppress, we review the trial court's factual findings for clear error. *See State v. Preece*, 971 P.2d 1, 4 (Utah Ct.App. 1998); *State v. Case*, 884 P.2d 1274, 1276 (Utah Ct.App.1994). However, because the determination of whether an encounter with law enforcement officers constitutes a seizure under the Fourth Amendment " ' "calls for consistent application from one police encounter to the next, regardless of the particular individual's response to the actions of the police," ' " such determination is a legal conclusion that we review for correctness. *State v. Carter*, 812 P.2d 460, 465 n. 3 (Utah Ct.App.1991) (quoting *United States v. Maragh*, 894 F.2d 415, 417 (D.C.Cir.1990) (omitting citations)) (emphasis omitted); *see State v. Bean*, 869 P.2d 984, 985 & n. 2 (Utah Ct.App.1994). Likewise, "[a]lthough we afford some ' "measure of discretion" ' to the trial court's application of the standard, whether a set of facts supports a reasonable articulable suspicion is a question of law that we review for correctness." *Preece*, 971 P.2d at 4 (citations omitted); *accord Case*, 884 P.2d at 1276.

## ANALYSIS

### Nature of the Stop

¶ 9 Our inquiry focuses first on whether Ray was seized for purposes of the Fourth Amendment during her encounter with Officers Eldard and Jones before the search of her bags. Ray argues that a seizure occurred both at the time Officer Eldard requested her identification, and when he retained the identification, stepped aside, and conducted the warrant check that lasted approximately five minutes. The City counters that Ray was not seized until after the incriminating evidence was found.

¶ 10 There are generally three levels of constitutionally permissible encounters between law enforcement officers and the public:

"(1) an officer may approach a citizen at anytime [sic] and pose questions so long as the citizen is not detained against his will; (2) an officer may seize a person if the officer has an 'articulable suspicion' that the person has committed or is about to commit a crime; however, the 'detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop'; (3) an officer may arrest a suspect if the officer has probable cause to believe an offense has been committed or is being committed."

*State v. Deitman,* 739 P.2d 616, 617–18 (Utah 1987) (per curiam) (citations omitted). Our analysis here turns on whether Ray's interchange with Officers Eldard and Jones was a level one encounter or level two stop.

■ ¶ 11 A level one encounter "is a voluntary encounter where a citizen may respond to an officer's inquiries but is free to leave at any time." *State v. Jackson,* 805 P.2d 765, 767 (Utah Ct.App.1990); *accord Bean,* 869 P.2d at 986 (" '[A] seizure within the meaning of the fourth amendment does not occur when a police officer merely approaches an individual on the street and questions him, if the person is willing to listen.' ") (citation omitted). "As long as the person 'remains free to disregard the questions and walk away, there has been no intrusion upon that person's liberty or privacy as would under the Constitution require some particularized

and objective justification.' " *Jackson,* 805 P.2d at 767 (quoting *United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980)). With a level two stop, however, the person is seized for purposes of the Fourth Amendment, "when the officer ' "by means of physical force or show of authority has in some way restrained the liberty" ' of a person." *Bean,* 869 P.2d at 986 (quoting *Mendenhall,* 446 U.S. at 552, 100 S.Ct. at 1876 (quoting *Terry v. Ohio,* 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 1879 n. 16, 20 L.Ed.2d 889 (1968))). Hence, a level one encounter becomes a level two stop and "a seizure under the fourth amendment occurs when a reasonable person, in view of all the circumstances, would believe he or she is not free to leave." *Jackson,* 805 P.2d at 767. This is true "even if the purpose of the stop is limited and the resulting detention brief." *State v. Steward,* 806 P.2d 213, 215 (Utah Ct.App.1991); *accord State v. Sierra,* 754 P.2d 972, 975 (Utah Ct.App.1988) (citing *Delaware v. Prouse,* 440 U.S. 648, 653, 99 S.Ct. 1391, 1395, 59 L.Ed.2d 660 (1979)).

"Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled."

*State v. Patefield,* 927 P.2d 655, 659 (Utah Ct.App.1996) (quoting *Mendenhall,* 446 U.S. at 554, 100 S.Ct. at 1877).

■ ¶ 12 First, it is well settled that Officer Eldard's request for identification alone did not constitute a level two stop. In *Deitman,* an officer investigating a burglary called to defendants who crossed the street to approach the officer, requested identification, and questioned defendants about their presence in the area. *See Deitman,* 739 P.2d at 617. On appeal from their convictions for burglary and theft, defendants argued they were illegally seized when they were initially stopped with no probable cause. *See id.* The Utah Supreme Court, however, rejected this contention, holding that defendants' initial contact with the officer was only a level

one encounter and "[t]he officer was justified in asking defendants for identification and an explanation of their presence in an area where police had responded to a burglar alarm." *Id.* at 618. As this court has reiterated, a request for identification alone, " 'as a matter of law, . . . cannot constitute a show of authority sufficient to convert an innocent encounter into a seizure.' " *Jackson,* 805 P.2d at 768 (quoting *United States v. Castellanos,* 731 F.2d 979, 983 (D.C.Cir.1984)); *accord Bean,* 869 P.2d at 987; *see also Florida v. Royer,* 460 U.S. 491, 501, 103 S.Ct. 1319, 1326, 75 L.Ed.2d 229 (1983) (plurality opinion) ("Asking for and examining [defendant's] ticket and his driver's license were no doubt permissible in themselves. . . .").

¶ 13 Nonetheless, Ray asserts that the level one encounter escalated to a level two stop during the warrant check. We agree. Ray was confronted with two uniformed officers, with "[b]adge, gun, the whole works." After Officer Eldard obtained Ray's identification, he did not view the information and return the identification card. Rather, he retained the identification and stepped away from Ray, as Officer Jones continued the questioning. Still holding Ray's identification, Officer Eldard then used his radio to check for outstanding warrants, which took approximately five minutes. Given the totality of the circumstances, it is clear that a reasonable person in Ray's position would not feel free to just walk away, thereby abandoning her identification, let alone to approach Officer Eldard, take back her identification, and then leave.[1] Instead, Officer Eldard's retention of her identification during the warrant check[2] sufficiently restrained Ray's freedom that she was seized for purposes of the Fourth Amendment.[3]

¶ 14 Generally, when a person's identification or other important papers are taken by a law enforcement officer, a reasonable person would not feel free to leave. LaFave explains that "an encounter becomes a seizure if the officer engages in conduct which a reasonable [person] would view as threatening or offensive even if performed by another private citizen. This would include such tactics as . . . *holding a person's identification papers* or other property. . . ." 4 Wayne R. LaFave, *Search and Seizure* § 9.3(a), at 102–03 (1996) (footnotes omitted) (emphasis added). For example in *Florida v. Royer,* 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) (plurality opinion), the United States Supreme Court examined a similar situation. There, the defendant was approached by two plainclothed detectives. *See id.* at 493, 103 S.Ct. at 1321–22. On request, the defendant

1. We are mindful that Officer Eldard testified that had Ray asked for the return of her identification so she could leave, he would have allowed her to do so. Because the record shows no indication that Officer Eldard communicated this subjective intention to Ray, it is irrelevant to our analysis. *See United States v. Mendenhall,* 446 U.S. 544, 554 n. 6, 100 S.Ct. 1870, 1877 n. 6, 64 L.Ed.2d 497 (1980) (opinion of Stewart, J.) ("[T]he subjective intention of the [officer] is irrelevant except insofar as that may have been conveyed to the respondent."); *State v. Patefield,* 927 P.2d 655, 659 (Utah Ct.App.1996) ("[R]egardless of the circumstances, '[t]he test for when [a] seizure occur[s] is objective and depends on when the person reasonably feels detained, not on when the police officer thinks the person is no longer free to leave.' ") (quoting *State v. Ramirez,* 817 P.2d 774, 786 (Utah 1991)) (second and third alterations in original). We also observe that although an officer is not required to inform a person he or she is free to leave during a level one encounter, *see Mendenhall,* 446 U.S. at 555, 100 S.Ct. at 1878, such a warning might aid the officer from unwittingly escalating the encounter to a level two stop.

2. A warrant check will not per se escalate the encounter into a level two stop. *See State v. Higgins,* 884 P.2d 1242, 1245 n. 2 (Utah 1994). The case *sub judice,* however, is not the situation where an officer views the identification, obtains the desired information, and promptly returns it. Provided that, in conjunction with the other circumstances, a reasonable person would feel free to leave, the officer may run a warrant check or make any other use of the information.

3. Although this point was argued to the trial court and the court denied the motion to suppress, such conclusion does not contradict the trial court's findings. That is, the trial court found that "had Ms. Ray's ride appeared *and the warrants check proved negative* she would have been free to go. Additionally, had she asked she would have been permitted to leave *once the warrants check had been completed.*" (Emphasis added.) Such finding passes only on the circumstances following the warrant check, whereas the critical time at issue is *during* the check when Ray consented to the search, and at a minimum permits the inference that during the check a reasonable person would not have felt free to leave.

gave the detectives his airline ticket and identification. *See id.* at 494, 103 S.Ct. at 1322. Without returning the ticket and identification, the detectives asked the defendant to accompany them to a room, which he did without a verbal response. *See id.* In the room, the defendant consented to a search of his bags, in which the detectives found drugs. *See id.* at 494–95, 103 S.Ct. at 1322. The Court concluded that although the defendant was not seized with the initial request for the ticket and identification, the retention of these items, coupled with the other factors, created circumstances that "surely amount[ed] to a show of official authority such that 'a reasonable person would have believed that he was not free to leave.' " *Id.* at 501–02, 103 S.Ct. at 1326 (quoting *Mendenhall,* 446 U.S. at 554, 100 S.Ct. at 1877 (opinion of Stewart, J.)) (omitting footnote); *see also id.* at 511–12, 103 S.Ct. at 1331 (Brennan, J., concurring in the result) ("By identifying themselves and asking for [the defendant's] airline ticket and driver's license the officers, as a practical matter, engaged in a 'show of authority' and 'restrained [the defendant's] liberty.' ") (citation omitted)).

¶ 15 The Ninth Circuit Court of Appeals reached the same conclusion in *United States v. Chan–Jimenez,* 125 F.3d 1324 (9th Cir. 1997). There, the defendant, of his own volition, had pulled his truck to the roadside and raised the hood when an officer approached. *See id.* at 1325. The officer asked for and received the defendant's license and registration, confirmed they were in order, and, without returning the documents, asked to look in the bed of the defendant's truck. *See id.* The defendant raised a tarp to reveal a white sack, which later proved to contain 245 pounds of marijuana. *See id.* The court examined the totality of the circumstances and held that the defendant "was seized within the meaning of the Fourth Amendment when [the officer] obtained and failed to return his driver's license and registration, and proceeded with an investigation." *Id.* at 1326; *see also, e.g., United States v. Lee,* 73 F.3d 1034, 1040 (10th Cir.1996) (holding that the officer's "request to search the car was not a consensual encounter because the Defendants 'would not reasonably have felt free to leave or otherwise terminate the encounter' with [the officer] because their documents had not been returned") (quoting *United States v. Lambert,* 46 F.3d 1064, 1068 (10th Cir.1995));[4] *Lambert,* 46 F.3d at 1068 (holding that although DEA agents permissibly approached defendant to examine his ticket and identification, "what began as a consensual encounter quickly became an investigative detention once the agents received [the defendant's] driver's license and did not return it to him"); *Reynolds v. Maryland,* 130 Md.App. 304, 746 A.2d 422 (1999) (holding that defendant was seized when officers approached defendant, questioned him, and, upon receiving defendant's name and date of birth, ran a warrant check that took five minutes); *State v. Holmes,* 569 N.W.2d 181, 185 (Minn.1997) (noting that it was undisputed defendant was seized when the officer received and retained defendant's university identification card); *State v. Godina–Luna,* 826 P.2d 652, 655 (Utah Ct.App.1992) (holding that following completion of traffic stop "defendants were not free to leave be-

---

4. We are not persuaded by the City's argument that those cases in which the encounter at issue followed a traffic stop are ipso facto distinguishable. Although a prior traffic stop may be part of the totality of the circumstances considered, the determination of whether there exists a level one encounter or level two stop is based on if a reasonable person would feel free to leave, regardless of what preceded. As the Tenth Circuit Court of Appeals stated,

"[O]nce the officer has returned the driver's license and registration in a routine traffic stop, questioning about drugs and weapons or a request for voluntary consent to search may be 'an ordinary consensual encounter between a private citizen and a law enforcement official' so long as a reasonable person under the circumstances would believe he was free to leave or disregard the officer's request for information.

*United States v. McKneely,* 6 F.3d 1447, 1451 (10th Cir.1993) (citations omitted); *see Patefield,* 927 P.2d at 659 (holding that after completing traffic stop, determination of whether defendant was seized turns on "whether, when viewed under an objective standard, someone in [defendant's] position would reasonably have felt free to leave"); *see also United States v. Lambert,* 46 F.3d 1064, 1068 n. 3 (10th Cir.1995) ("While not directly on point ... the principle of the traffic stop cases, i.e., that an individual's identification should be retained no longer than necessary to accomplish the purpose for its request, does apply.").

cause the deputy continued to hold their papers"); *State v. Johnson*, 771 P.2d 326, 328 (Utah Ct.App.1989) ("Defendant was, therefore, seized when [the officer] took her name and birthdate and expected her to wait while he ran a warrants check."), *rev'd on other grounds*, 805 P.2d 761 (Utah 1991) (per curiam).

¶ 16 The City relies upon *Deitman, Bean,* and *Jackson* to argue that the initial level one encounter did not progress into a level two stop. A closer examination of those cases, however, reveals that such reliance is misplaced. First, *Deitman, Bean,* and *Jackson* addressed only whether the initial contact between the respective officers and defendants was a level two stop. In *Deitman,* for example, the court examined only whether the *initial* request for identification was permissible; the court did not address whether a seizure occurred during the subsequent warrant check.[5] *See Deitman,* 739 P.2d at 617–18. Likewise, the defendant in *Bean* argued only that the contact with the officer at its *inception* was a seizure, and did not argue the significance of the subsequent conduct. *See Bean,* 869 P.2d at 985. Accordingly, the court held that "the trial court was correct in concluding the *initial encounter* between Deputy Schroeder and defendant qualifies as a level one stop," *id.* at 987 (emphasis added), and expressly declined to comment on whether the questioning following the initial encounter constituted a seizure. *See id.* at 988 & n. 3 (concluding no Fourth Amendment violation existed because if there was a seizure, it was supported by a reasonable suspicion).[6] In addition, the *Jackson* court only determined whether there was a seizure when the officer parked behind the defendant's car and when he requested the defendant's identification. *See Jackson,* 805 P.2d at 767–69. Accordingly, *Dietman, Bean,* and *Jackson* are inapposite and we reject the City's invitation to impart

more meaning to these cases than that for which they actually stand.

¶ 17 Consequently, although Ray was not seized by Officer Eldard's original request for identification, this level one encounter escalated into a level two stop when Eldard retained Ray's identification while running the warrant check. During this time a reasonable person would not have felt free to leave.

### Reasonable Suspicion

¶ 18 Having determined that Ray was seized for purposes of the Fourth Amendment at the time she consented to the search of her bags, we now turn to the support for the seizure. "[A] level two stop ... must be supported by reasonable suspicion [or it] violates the Fourth Amendment to ·the United States Constitution." *Bean,* 869 P.2d at 988; *see also* Utah Code Ann. § 77–7–15 (1999) ("A peace officer may stop any person in a public place when he has a reasonable suspicion to believe he has committed or is in the act of committing or is attempting to commit a public offense and may demand his name, address and an explanation of his actions."). " 'While the required level of suspicion is lower than the standard required for probable cause to arrest, the same totality of facts and circumstances approach is used to determine if there are sufficient "specific and articulable facts" to support reasonable suspicion.' " *City of St. George v. Carter,* 945 P.2d 165, 168 (Utah Ct.App.1997) (quoting *State v. Case,* 884 P.2d 1274, 1276 (Utah Ct.App.1994) (quoting *Terry v. Ohio,* 392 U.S. 1, 21, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889 (1968))), *cert. denied,* 953 P.2d 449 (Utah 1998). "In determining whether this objective standard has been met, the focus necessarily centers upon the facts known to the officer immediately before the stop." *State v. Friesen,* 1999 UT App 262, ¶ 12, 988 P.2d 7.

---

5. Indeed, it is unclear from the *Deitman* court's recitation of facts whether the officer even retained the defendants' identification during the warrant check as occurred here. *See Deitman,* 739 P.2d at 617.

6. As in *Deitman,* the *Bean* court's recitation of facts does not describe that the officer retained

identification while conducting a warrant check, but simply states that the officer "asked for identification, which they both produced. [The officer] did a warrants check and discovered that defendant had an outstanding warrant." *Bean,* 869 P.2d at 985.

¶ 19 Viewing the facts known to Officers Eldard and Jones at the time of the seizure, it is clear there was no reasonable articulable suspicion supporting the seizure. First, the facts known [7] to the officers regarding Ray were at least as consistent with lawful behavior as with the commission of a crime.[8] The testimony of Officers Eldard and Jones resolves the question. By their own testimony, Officers Eldard and Jones had no knowledge of any violation of the law that Ray might have committed or was about to commit. Accordingly, there is no basis on which to justify the level two stop, and the seizure, therefore, violated Ray's rights under the Fourth Amendment.

## CONCLUSION

¶ 20 We conclude that the trial court erred in denying Ray's motion to suppress the evidence obtained when she consented to the search of her bags. Ray consented while Officer Eldard retained Ray's identification during the warrant check. Because a reasonable person in Ray's position would not have felt free to leave during this time, Ray was seized for purposes of the Fourth Amendment. Furthermore, because Officers Eldard and Jones had no suspicion of any wrongdoing by Ray at this time, the seizure violated her rights under the Fourth Amendment. Consequently, Ray's consent to search her bags was invalid [9] and the trial court erred in denying her motion to suppress.[10]

¶ 21 Reversed and remanded for further proceedings consistent with this decision.

¶ 22 WE CONCUR: PAMELA T. GREENWOOD, Presiding Judge, and GREGORY K. ORME, Judge.

7. The City relies on the observations of Boehner to argue the officers had a reasonable suspicion justifying the seizure. However, Boehner testified that he did not communicate these observations to the dispatcher or the officers, and instead only mentioned that Ray had been in front of the store for two hours.

8. The following facts were known at the time of the seizure: (1) Boehner had reported—and the officers received a dispatch for—a "suspicious female," regarding Ray; (2) Ray was standing outside the store near a pay phone; (3) Ray had made an earlier purchase in the store; (4) an empty container near Ray confirmed she had made a purchase; (5) Ray was waiting for a ride to work which had not materialized; (6) although Ray stated at first she had been waiting for thirty minutes, Boehner said she had been there for two hours; (7) while being questioned, Ray appeared nervous, talked fast, and shifted her weight from one foot to the other.

9. The parties do not dispute that the evidence at issue resulted from the illegal seizure.

10. Because of our decision on this basis, we have no need to address Ray's argument, raised for the first time on appeal, that her consent was involuntary.